## Gyger's Appeal.

1. In the settlement of partnership accounts, the allowance or refusal of interest depends upon the circumstances of each particular case; any unbending rule would work injustice in some case.
2. Considerations in this case for allowing interest from the settlement of the accounts stated.
3. Compensation is not to be allowed to the liquidating partner.
4. In equity, costs do not always follow a decree against a party.
5. Costs in equity rest on the sound discretion of the court, and are to be awarded or refused according to the justice of each particular case.

62 73
129 640

62 73
134 27
134 491

62 73
145 472

62 73
186 396

62 73
200 588

62 73
203 1 77

62 73
206 1217

62 73
207 11

62 73
212 1597

6. Whenever an account is intricate or doubtful, there should be no costs, especially in partnership accounts.

7. In intricate or doubtful partnership accounts, costs are usually charged to the estate.

8. Costs under the circumstances in this case charged to the partnership estate.

. May 6th and 7th 1869. Before THOMPSON, C. J., AGNEW, SHARSWOOD and WILLIAMS, JJ. REED, J., absent.

Appeal from the Court of Common Pleas of *Lancaster county:* In Equity: No. 61, to May Term 1869.

The bill in this case was filed, September 4th 1865, by Henry Musselman and Joseph Clarkson against John Gyger.

It alleged that, on the 3d of March 1856, Henry Musselman, David Bair, Benjamin Eshleman, and John Gyger (the defendant) entered into partnership as bankers in the city of Lancaster, each to invest an equal portion of the capital, which was so done, and each to receive an equal share of the profits; the partnership was carried on until the 2d of July 1859, when it was dissolved by mutual consent. The business was carried on in a house in East King Street, Lancaster, which, during most of the time of the partnership, and at its dissolution, was partnership property: immediately on the dissolution of the partnership, the defendant commenced banking in the same house and continued until the 4th of May 1864. On the 6th of August 1860, Bair sold his interest, being one-fourth, to Joseph Clarkson, one of the plaintiffs. After the dissolution, all the partnership assets passed into the hands of the defendant together with the goodwill of the business; the defendant undertook to collect the assets and pay the balance to the retiring partners. The defendant by agreement with them, was to occupy the banking-house and account for the rent; the rent of the house was worth $800 per annum, and if there had been no agreement to pay rent he should pay that amount for use and occupation. The defendant has settled no account of the partnership estate although frequently requested, but pretends that the profits have been absorbed by expenses and that he ought not to pay rent because he has occupied the house in settling the affairs of the firm, and is entitled to the rent for his services. The plaintiffs charge that there is a large balance due to them, that the defendant is not entitled to compensation for settling the affairs.

The prayers were that an account be taken and the defendant be directed to pay the plaintiffs what may appear to be due on such account and for further relief.

The defendant answered, admitting partnership from March 3d 1856 to April 9th 1859, and its continuance from that time until July 2d in the same year, under several written agreements, which he made part of his answer. Admitting that the banking-

house belonged to the firm, he alleged that after the dissolution he necessarily used it for winding up the business; the house, with the other assets, by the agreement became his property to pay the debts, the firm being then insolvent, its debts amounting to $291,172.79 : that he carried on banking in the same building until May 1864, "for the purpose of saving the assets, paying the debts and extricating from insolvency, and securing the business and assets he had undertaken to liquidate and settle," &c. "That the large debt due and maturing required his extensive credit and large resources to carry on and continue, whilst by careful nursing, constant extensions, and the large use of his individual means he realized the assets of the firm, insolvent and abandoned by his partners, and transferred to him absolutely, only providing for paying the debts, which he has done." He denied any liability to account to Clarkson, who was a stranger to the partnership; and averred that he was at no time liable to account to the partners except as stipulated in the agreement of April 9th 1859, which transferred to him the assets of the firm absolutely in consideration of his paying the debts of the firm, and any payments made to any of them since were a gratuity; that he never agreed to pay to his partners any balance or any rent for the banking-house, and denied all responsibility for rent; he averred that all the partnership debts were paid, assets collected and business closed, except that the partnership if an account were settled, would be largely in debt to him for advances, expenses and services in settling the business and assuming the liabilities of the firm.

A replication was filed and A. Slaymaker, Esq., appointed examiner and master.

The articles of March 3d 1856, agreed to establish a partnership between the parties as named in the bill, for three years from March 24th 1859; besides the ordinary stipulations it was agreed that neither partner should sell his interest without the consent of all the others; but if one withdrew without such consent, he should receive his interest in the firm, to be determined by referees chosen as therein provided. By the articles of April 9th 1859, it was agreed that the partnership should be continued under the original terms until July 2d 1859, with the stipulation that at that date "the said banking-business, good-will and all the privileges which the said firm enjoys, pass over to John Gyger. And we, each for himself, his heirs, executors and administrators, assign and transfer his or their right and interest in the said business on July 2d 1859, to John Gyger, his heirs and assigns : provided, that the said John Gyger render unto us, from time to time, a just and true account of the settlement by him of all the liabilities and assets of said firm, as the books, papers and accounts of said firm set forth on July 2d next; provided,

[Gyger's Appeal.]

further, that in case of the decease of John Gyger before the business is finally settled, the surviving partner or partners shall finally close and settle the same."

The name of the original firm was "John Gyger & Co.:" after the dissolution the defendant continued the business individually under the same name.

On a preliminary question, the master having reported the facts, the court below decided that the defendant was liable to account to both plaintiffs, and recommitted "the report to the master for such further examination as may be required."

The master in his second report found the creation, continuance and renewal of the partnership as set out in the pleadings with their accompanying agreements. He further found that the defendant, immediately on the dissolution of the firm, and in accordance with the agreement of July 2d 1859, took possession of the banking-house and the assets of the firm, and also commenced banking on his own account under the old firm-name and so continued until May 4th 1864, when the First National Bank of Lancaster was established and rented the banking-house, and during all that time he was engaged in settling the affairs of the old firm using the banking-house for that purpose; he found that the assets of the old firm were $264,550.11, of which $31,757.45 were bills protested, about $25,000 of which could not possibly be realized, and much of that collectable only by suit, and $15,285.77 were real estate; he found also that the amount of expenses, including salaries of clerks in conducting the business of the settlement, rent, &c., with which the old firm should be charged, was $2102.29; that the rent of the banking-house, *including* the amount charegable to the old firm, was $800 per annum; that all the assets were collected but $962.49.

The master further reported: "Under these circumstances, the immediate winding up of the business could scarcely have failed to result in heavy loss—not to the creditors, for the large resources of the members of the firm would have enabled them, readily, to meet any deficiency in its assets that could then have occurred—but to the partners. Obviously, therefore, the policy to be pursued in settling the affairs of the partnership (with reference to the interests of the persons composing it), was, as far as practicable, without detriment to its credit,. to protract that settlement, thus enabling them to avail themselves of opportunities to realize doubtful assets, which, in the course of time, it might be hoped or expected would occur. This policy Mr. Gyger pursued, with a success which, while unquestionably attributable in part to his own efforts and the extent of his resources, was, in a still greater degree, due to the expansion of the currency and general improvement in business which followed the breaking out of the war, as well as to the fact that, at the time

of the dissolution of the firm, its credit was entirely unimpaired. Instead of closing, he continued, to some extent, the business of the firm, renewing certificates of deposit and notes, and receiving new deposits (mainly from old depositors), and occasionally discounting paper. The deposits made with the old firm while its business was in the course of settlement were quite considerable in amount, being, during some years, not less than $120,000, and in the fourteen months preceding the establishment of the First National Bank, reaching the sum of $120,074. The paper discounted was not large in amount, being, during the first year after the dissolution, about $2400, and during each subsequent year considerably less. During the whole space of time between the dissolution and the final closing of the concern, it is conceded that the discounts did not amount to more than $10,000. By continuing to receive deposits, Mr. Gyger was placed in possession of funds for the discharge of accruing liabilities at a very moderate rate of interest, and when necessary he advanced money from his own resources—always, however, charging the firm with interest at the legal rate. He thus was enabled to postpone the winding up of the business until it could be accomplished most advantageously for the partners, and finally succeeded in realizing nearly, if not all of the doubtful assets, and in obtaining for the real estate a price considerably larger than could have been had at the time of the dissolution. The business was closed not only without loss, but with some profit. Out of that profit he has paid to B. Eshleman and H. Musselman, partners, and Joseph Clarkson, transferee of David Bair, the remaining partner, each the sum of $1000."

The master stated these questions, amongst others, as those to be determined:—

3. Is the defendant liable to account for rent of the banking-house, and for what amount?

4. Is he liable to account for the "good-will?"

5. Is he liable to account for profits accruing during the continuance of the business of the old firm after dissolution?

6. Is he to be allowed for clerks, counsel and rent of the banking-house and other expenses?

7. Is he entitled to compensation for settling the business of the old firm or in continuing the business after dissolution?

The master found that the defendant was liable to account for rent at the rate of $600 per annum, excluding the amount chargeable to the old firm; that he was not liable to account for the good-will; that he was chargeable with profits made during the continuing of the business after dissolution, and fixed the amount of profits at $200; that there were to be allowed for counsel fees, clerks' salaries, &c., rent, &c., $2102.29, as above stated; this included salary to Joseph Clarkson, plaintiff, who had been em-

ployed as clerk; that he was not entitled to compensation "for merely winding up the business of the old firm," but was entitled to compensation for conducting the business of the firm after dissolution; and fixed the sum at $100.

He then stated an account in which amongst other things, he made charges and allowances in accordance with the foregoing decisions, and charged the defendant besides, with

"Interest on balance, $3598.79, due to old firm from

May 1st 1865 to December 10th 1868,  .  .    $801.40
Interest on rent of banking-room (2900), as it fell due

up to December 10th 1868,  .  .  .  .    $777.19"
He also allowed "interest on balance due to John

Gyger,  .  .  .  .  .  .  .  .    $219.82"
The account showed a balance of $8177.38, due by the defendant to firm, and the master awarded $2044.34½ as the share of each partner.

He further reported:—"The defendant having refused to account, and denied his liability to do so, thus rendering necessary this suit and all the proceedings therein had, it is recommended that the costs of this as well as of the previous report of the master be imposed upon him."

The defendant excepted to the report in not allowing enough for expenses; in not allowing the defendant proper compensation; in charging him with rent and interest.

The plaintiffs excepted to the report, that the master had not charged against the defendant sufficient rent, nor the value of the good-will; that too much for expenses had been allowed to him, and that he had been allowed compensation for conducting the business after dissolution.

The court overruled the exceptions of both parties and confirmed the report.

The defendant appealed, and assigned for error, that the court erred—

1. In requiring him to account.

2. In denying him compensation for winding up the business of the firm.

3 & 4. In charging him rent, and any part of the expenses, whilst settling the firm business.

5. In charging him interest prior to the settlement of the accounts.

6. In allowing compensation to Joseph Clarkson.

7. In charging the defendant with the costs.

*O. J. Dickey* and *J. E. Hiester,* for appellants.—On the question of compensation, they referred to Collyer on Partnership, § 328; Bradley *v.* Chamberlin, 16 Vermont 613; Wilby *v.* Phinney, 15 Mass. R. 120. On the subject of interest, they referred to Story

on Partnership, § 182; Beacham v. Eckford, 2 Sandf. Ch. R. 116;
Dexter v. Arnold, 3 Mason 284.   Also to Beacham v. Eckford,
*supra*, as to costs.

R. W. Shenk and D. G. Eshelman, for appellees.—As to
compensation, they referred to Beatty v. Wray, 7 Harris 516.

The opinion of the court was delivered, October 19th 1869, by
· Sharswood, J.—It is not necessary to consider any of the
assignments of error, except the 5th and 7th.   The court were
clearly right in decreeing the account; and the master adopted
and applied correct principles on all questions raised before him,
except as to interest and costs.   In regard to his conclusions of
fact from the evidence, there is no such palpable error as, accord-
ing to the well-established practice in chancery, would have jus-
tified the court in correcting his report.

The 5th assignment of error is "in charging John Gyger in-
terest prior to the settlement of accounts between the parties."
Mr. Lindley remarks that the principles upon which, in taking part-
nership accounts, interest is allowed or disallowed, do not appear
to be well settled: 1 Lindley on Partnership 649.   In some cases
it has been held that the period of the dissolution of a partnership
is the proper time to make a rest for this purpose: Stoughton v.
Lynch, 2 Johns. Ch. R. 209; Hollister v. Barkley, 11 N. H.
501.   Judge Story has laid down a different rule.   "Interest,"
he says, "is not allowed upon partnership accounts generally,
until after a balance is struck on a settlement between the part-
ners, unless the parties have otherwise agreed or acted in their
partnership concerns:" Dexter v. Arnold, 3 Mason 289.   Vice-
Chancellor Sandford, of New York, in Beacham v. Eckford, 2
Sandf. Ch. R. 116, after a review of all the authorities, came to
the conclusion that there is no general rule established, but that
the allowance or refusal of interest depends upon the circum-
stances of each particular case.   This seems much the safest prin-
ciple to adopt in view of the confidential relation of the parties,
and the variety and complication of such accounts.   No unbend-
ing rule could be laid down which would not, in particular in-
stances, work great injustice.

There are equities in this case which we think ought to weigh
in favor of the accountant.   Mr. Gyger undertook to liquidate
the business of a banking firm with a large amount of outstanding
·· and doubtful debts due to it, and a correspondingly large amount
of liabilities.   To do so without loss, it was necessary that he
should continue to receive deposits and issue certificates of loan,
by which he was enabled, in effect, to borrow at a low rate of in-
terest, in order to meet the liabilities as they fell due.   For this
purpose he was also at first compelled to make advances.   Thus
he gained time for the collection and conversion of the assets,

which, after much trouble and considerable litigation, he accomplished without serious loss. Of his diligence and fidelity there is no question. He occupied the banking-house of the old firm, and as he used a part of it for his private business, he is very properly charged with a fair rent for such part. The master has, however, added interest on this rent as well as upon a balance, which he strikes May 1st 1865, a date adopted, probably, in reference to the sale of the banking-house. He allows him interest on the amounts advanced by him before that period. According to well-settled principles, he has disallowed all compensation for his services in liquidating the business: Beatty *v.* Wray, 7 Harris 516; Brown *v.* McFarland, 5 Wright 129. Had Mr. Gyger proceeded immediately to press the collection of the debts due to the bank, it is highly probable there would have been no capital or profits to divide, if the partners would not have been obliged, out of their separate estates, to meet a considerable deficit. It was impossible for him to know at any time what the balance really was until it was finally ascertained and struck by the master; for it is to be observed that there was no agreement as to what amount of rent should be paid, and the apportionment of the expenses between his own private business and that of the old firm, carried on in the same building and by the same clerks and servants, had to be settled. He might not unreasonably expect that under the circumstances his late copartners would not object to allow him a reasonable compensation for his services. The rule which denies it altogether in his case works hardly, for the whole trouble and responsibility were thrown upon him. He did make a partial distribution of funds in his hands—at what time we are not informed. In view of these facts we are of the opinion that the date of the actual settlement and ascertainment of the balance is the period from which it would most comport with equity to compute the interest. The account should therefore be corrected by striking out the item of credit of $219.82, on one side, and the items of charge of $801.40 and $777.19 on the other side.

The 7th error assigned is, that the court below erred in charging all the costs upon John Gyger. In equity costs do not always follow a decree against a party. They rest on the sound discretion of the court, and are to be awarded or refused, according to the justice of each particular case: 3 Daniell's .Ch. Pr. 2. It has been decided that wherever an account is intricate or doubtful, there should be no costs, Pitt *v.* Page, 1 Bro. P. C. 1, and this is especially applicable to partnership accounts: Collyer on Partn. 339. In such cases the costs are usually divided, or what is practically the same thing, are taxed on the partnership effects: Hutcheson *v.* Smith, 5 Irish Eq. 117; Jones *v.* Morhead, 3 B. Monroe 385; Taylor *v.* Cawthorne, 2 Dev. Eq. 221. There were conflicting claims in this case on both sides, and each party has

[Gyger's Appeal.]

been found as to some of them to be in the wrong. There were questions of real doubt and difficulty as to the amount of rent, and the apportionment of expenses as well as to interest and compensation. It is not easy to see how they could have been settled without a suit or a reference to mutual friends. We cannot give so much weight as the master has done to the general denial by defendant in his answer of liability to account. It was not that which rendered the suit unavoidable. The costs of this litigation appear, therefore, to be a necessary expense in consequence of the disputes between the parties in closing up the concerns of this copartnership. It is an item in the amount of profit and loss, which it would have been much better for all the partners to have saved by mutual concessions or otherwise, but which cannot in equity be charged upon one of them exclusively: Caldwell *v.* Zeiber, 7 Paige 508. We are of the opinion that all the costs in the court below as well as the costs of this appeal should be paid out of the partnership money in the hands of the defendant, John Gyger, and that he should be allowed a credit therefor in his account.

> Decree reversed, and record remitted to the court below, that the decree may be there modified according to this opinion.