Greenan, Appellant, *v.* Ernst, Appellant.

496

Argued January 11, 1962. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*Patrick H. Sullivan,* with him *John V. Thornton, Thomas McCarthy, William P. McVay, James F. McVay,* and *McVay and McVay,* for plaintiff, appellant.

*John C. Bane, Jr.,* with him *Leonard L. Scheinholtz, John H. Scott, Jr., James D. Wolfe, James A. Deckop,* of the New York Bar, and *Reed, Smith, Shaw & McClay,* for defendants.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, October 5, 1962:

In 1911 J. H. Healey, a resident of McKean County and a pioneer in the "Bradford oil and gas field" died. Under the terms of his will his residuary estate was divided into three parts: one part was given outright to his 39 year old son, W. J. Healey, one part was given outright to his 24 year old daughter, Grace Healey Greenan, and one part was set up in trust for his 32 year old son, Norman Healey,[1] for life and, upon his death, to W. J. Healey and Mrs. Greenan. W. J. Healey and one R. V. Hill were named trustees under the trust but Hill resigned in 1912 and, thereafter, W. J. Healey acted as the sole trustee.

Included in J. H. Healey's residuary estate were a fee-owned 20 acre tract of land and an oil lease of an 80 acre tract of land, both oil producing tracts being located near Bradford, Pa., the 80 acre tract being known as "Shepard Run". In his will, J. H. Healey requested his wife, children and trustees to continue the operation of his oil and gas business for a period of at least five or ten years.[2] Pursuant to that request, W. J. Healey, Mrs. Greenan and W. J. Healey, as trustee for Norman Healey, pooled their interests and in June, 1913 formed a partnership known as Healey Oil Company (Healey Oil) for the purpose of "operating and producing oil and gas". The partnership agreement, in pertinent part, provided: (a) W. J. Healey, Mrs. Greenan and the Norman Healey trust each would have a third interest in the partnership; (b) W. J. Healey was to manage the business "in a good and skillful manner" and for the first six months was to receive a salary of $60 per month at the end of which time the salary was to be readjusted by agreement of

---

[1] It would appear that Norman Healey was somewhat retarded.

[2] Mrs. Healey never entered into the business.

the parties;[3] (c) the partnership was to drill new wells on property it presently owned as well as on after-acquired properties as the majority of the partners would agree; (d) W. J. Healey was to sell the oil produced except that Mrs. Greenan was to sell her proportion of the oil produced from the 20 acre tract; (e) by agreement of the parties the partnership might acquire other oil or gas properties. Nothing in this partnership agreement either *expressly* permitted or *expressly* prohibited the partners from engaging in the oil or gas business on their own.

The partnership went into active operation in 1913. In 1915, the partners sold the 20 acre tract for $6500 to one C. W. Moore. One month later, the same Moore sold to W. J. Healey, *personally*, an oil lease of property known as the Hunt property for $7500.[4] For his own account as an individual, W. J. Healey later purchased an interest in a so-called Van Scoy property (1919), a so-called Buchanan property (1926) and a so-called Forty-four property (1928), all being oil producing properties.

From 1915 through 1928, deposits were made in the Bradford National Bank in the following accounts: Healey—$1,320,730.40; Healey & Co.—$258,260.61; Healey, personal—$66,575.94; Norman Healey—$577.00; Healey Oil—$137,411.66.

On November 30, 1928, W. J. Healey, together with members of a Buffalo, N. Y. group, formed a Delaware corporation called Healey Petroleum Corporation (Healey Petroleum). This incorporation was preceded by the execution on November 19, 1928 of a contract

---

[3] No readjustment was ever made.

[4] The court below in its first adjudication said: "In view of the Shepard Run Transaction, the earlier transfer of the other partnership property to one Moore in what appears to be a wash sale becomes significant."

between W. J. Healey and one Ralph Hochstetter, the latter representing the Buffalo group. This contract provided: (a) W. J. Healey and Hochstetter were to join in "acquiring and developing by the water pressure method oil properties in the Bradford Field"; (b) for this purpose a corporation was to be organized with a capital of at least $2,000,000 of $100 par 7% cumulative dividend preferred stock plus two shares of no par common stock for each share of preferred stock sold; (c) each stock subscriber would purchase the stock in units, each unit consisting of one share of preferred stock and one share of common stock and, *for each unit sold, W. J. Healey was to be given the second of the two shares of common stock*; (d) the common stock was not to receive payment "by way of principal, or dividend" until every share of the preferred stock was retired at $110 (i.e., the par value of each share of preferred stock ($100) and a premium ($10)) plus full dividends cumulated at $7 per share per year;[5] (e) W. J. Healey would subscribe to one-quarter of the capital of the corporation within two years,[6] would serve as general manager and would turn over to the corporation any leases of undeveloped oil lands which he then had and all oil leases and oil producing land which he might after acquire; (f) W. J. Healey was to be permitted to operate the properties which he already had under development although the corporation might, within two years, if a price could be agreed upon, buy from W. J. Healey "all of his present operations." Upon formation of Healey Petroleum, the plan

[5] Upon retirement of all the preferred stock, Healey would then own 50% of the outstanding stock of the corporation.

[6] That is, W. J. Healey was bound to subscribe for 5000 shares of the preferred stock at $100 per share and 10,000 shares of the no par common stock at $1 per share, a total subscription of $510,-000.

was changed in that the amount of authorized preferred stock was raised from $2,000,000 to $5,000,000.[7]

After organization of the corporation and, more specifically, on December 3, 1928, *for the purpose of discharging his obligation to buy 5000 shares of the preferred stock and 10,000 shares of the common stock,* W. J. Healey offered to sell to Healey Petroleum—Healey Petroleum accepted the offer—"all of [his] oil properties in McKean County" which he was then operating, "comprising 243 acres of real estate"[8] and, in exchange, to receive 5000 shares of the preferred stock ($500,000), 10,000 shares of common stock ($10,000) and $965,000 in cash or notes of Healey Petroleum, a total purchase price of $1,475,000. Pursuant to this offer and acceptance, W. J. Healey transferred his ownership of the Hunt, Van Scoy, Buchanan and Forty-four properties to Healey Petroleum. At W. J. Healey's solicitation, Mrs. Greenan transferred to him her interest in the Shepard Run property and W. J. Healey, as trustee under the Norman Healey trust, transferred the trust's interest in Shepard Run to himself. W. J. Healey then transferred Shepard Run to Healey Petroleum for a price which he told Mrs. Greenan was $120,000.

Fully supported by the evidence, the court below found that W. J. Healey failed to disclose to Mrs. Greenan the fact that Healey Petroleum was interested in the purchase of Shepard Run when he secured a

---

[7] However, W. J. Healey was called upon to pay only one-quarter of the *originally planned* amount of the preferred and common stock, i.e., $510,000.

[8] Healey estate contended that the total acreage of the Hunt, Van Scoy, Buchanan and Forty-four properties—all held in W. J. Healey's own name—was 242.92 acres. From that, the estate contended that the Shepard Run property, held in the name of Healey Oil, was not included in the offer. The court below, on sufficient evidence, held otherwise.

transfer of her interest therein to him, that he fraudulently misrepresented to her that the price for Shepard Run was $120,000 and that such price was a fair price, and that he paid both Mrs. Greenan and the Norman Healey trust $40,000 for each of their respective interests.[9] The records of Healey Petroleum, under the item "Investments", listed the Hunt, Van Scoy, Buchanan, Forty-four *and* Shepard Run properties at a valuation of $1,471,327.50,[10] a valuation almost equal to the consideration set forth in W. J. Healey's offer to Healey Petroleum for the exchange of the properties for the preferred, common stock and cash. On Healey Petroleum's records the Shepard Run property was carried at a valuation of $315,232.83. The record clearly reveals that the consideration for the transfer to Healey Petroleum of these *five* properties, was $1,475,000, in cash and stock, which W. J. Healey received.

Ultimately, Healey Petroleum secured subscriptions for 38,155 units of the preferred and common stock, each unit costing $102. Thereupon, in accordance with the terms of the contract of November 19, 1928 (whereunder Healey was to receive one share of common stock for each unit subscribed) Healey received 38,155 shares of the common stock; 37,155 shares were received on November 4, 1929 and 1,000 shares were received on December 2, 1930.

The court found deposits were made in the following accounts: in *1929,* Healey—$1,854,268.20, Healey & Co.—$176,251.04 and Healey, Personal, $37,000.00; in *1930 and through 1935,* Healey—$1,280,865.55 and Healey—Personal, $174,651.08.

---

[9] Such payments were made partly in cash and partly in Healey Petroleum stock.

[10] This valuation was made by a competent oil and gas engineer employed by Healey Petroleum *as of January 3, 1929* and did not take into account either development costs or results after that date.

In May 1936, Healey Petroleum's business was in distress and its preferred stock dividends were eighteen months in arrears. At that time, a plan was evolved whereby holders of the preferred stock would surrender their stock and accept, in exchange for each share of $100 par 7% cumulative dividend preferred stock, a $100 par 5% debenture bond. W. J. Healey committed himself to give ½ share of common stock to each preferred stockholder who would surrender, for exchange under the plan, one share of the outstanding preferred stock. The plan was accepted unanimously and all the preferred stock was exchanged for the debenture bonds, W. J. Healey exchanging his own 4205 shares. In accordance with his agreement, W. J. Healey surrendered 18,516 shares of common stock.

Healey Petroleum's business later prospered to the extent that in 1948 United Refining Company purchased Healey Petroleum on such terms that all the debenture bonds were paid in full and each common stockholder received $62.50 per share.

W. J. Healey died on September 3, 1950 and the present equity action was instituted in June, 1951. In this action, instituted in the Court of Common Pleas of McKean County against W. J. Healey's estate, Mrs. Greenan[11] *originally* sought an accounting and dissolution of the 1913 family partnership known as Healey Oil. Her complaint averred that neither W. J. Healey nor his estate had ever accounted for or paid over her share in gas and oil properties held by W. J. Healey which Mrs. Greenan claimed were partnership properties. After hearing, the chancellor concluded: "(1) that [Healey] had appropriated partnership assets and

---

[11] Norman Healey died intestate on February 20, 1944. Under the terms of the J. H. Healey trust, Grace Greenan and Healey each then received absolutely outright one-half of the trust's interest in Healey Oil, making the share of each in Healey Oil a one-half interest.

income to his own use; (2) that he had engaged in self-dealing on his own account in the field of business of the partnership without the consent or knowledge of the other partners; (3) that no legal dissolution of the partnership had ever been effected; (4) that no proper accounting of partnership assets and income had ever been made; (5) that the releases executed by [Mrs. Greenan] were ineffective because they were procured by [Healey's] active fraudulent concealment of his breaches of his fiduciary obligations; (6) that independent affirmative acts of concealment upon the part of [Healey] excused [Mrs. Greenan's] delay in bringing the action." (*Greenan v. Ernst*, 393 Pa. 321, 143 A. 2d 32). The court then directed the Healey estate to render an accounting. From that decree an appeal was taken to this Court which, in a per curiam opinion, affirmed the decree. (*Greenan v. Ernst*, supra).

On February 16, 1959, W. J. Healey's estate filed a special account which it later revised by a supplemental account filed July 31, 1959. In these accounts, the Healey estate charged itself with gross receipts (without interest) of $1,729,574.56, claimed credits of $665,-850.21 and stated a balance due Mrs. Greenan of $1,-063,724.35. Mrs. Greenan took the position that the Healey estate was chargeable with $3,541,767, was entitled to credits of $392,962, and that the balance owed her was $3,148,805. In addition, Mrs. Greenan claimed interest on that balance up to April 30, 1959 of $3,-150,321, making her total claims $6,299,126.

In its final decree, from which these appeals are taken, the court found that the principal amount due Mrs. Greenan by the estate was $2,305,752,[12] allowed interest thereon up to August 31, 1960 in the amount

---

[12] Judgment was entered in the principal sum for $1,705,852 because $600,000 had already been paid by the estate.

of $2,279,280 and thus sustained a total claim against the estate of $4,585,032.

On the Healey estate's appeal (No. 229) three questions are raised: (1) whether Grace Greenan is entitled to one-half of the profits and the proceeds of the common stock given W. J. Healey by Healey Petroleum after the preferred stock units had been subscribed; (2) whether Grace Greenan is entitled to one-half of the capital gains realized by W. J. Healey's children on Healey Petroleum stock purchased and later sold by them?; (3) whether Grace Greenan is entitled to 6% interest from year to year on all gains accrued to Healey's account since 1913?

On Mrs. Greenan's appeal (No. 222) three questions are raised: (1) whether W. J. Healey's estate was entitled to take credit for compensation, over and above $60 per month, for managing the Healey Oil partnership; (2) whether W. J. Healey's estate was obliged to account for (a) a share of the salaries received by W. J. Healey for managing the various oil companies and (b) a share of profits received by W. J. Healey from various oil and gas *drilling operations* and for a share of drilling profits received by W. J. Healey's family as a result of gifts made to them by W. J. Healey of interests in *drilling operations*?

## The Estate's Appeal

The first question raised by the estate concerns its duty to account for more than 10,000 shares of the common stock of Healey Petroleum. At the time of the sale by W. J. Healey to Healey Petroleum of the five properties—in which the court below found Healey Oil had an interest—part of the consideration was 10,000 shares of the Healey Petroleum common stock. The estate *now* raises no question as to its duty to account for these 10,000 shares and the profits which arose therefrom. As to all the other shares of Healey Pe-

troleum common stock which W. J. Healey *subsequently* acquired, the estate takes the position that it is under no duty to account for such shares since such shares were acquired either by purchase or as compensation for services rendered by Healey. Even though it may be repetitious, it is most important to understand the *amount* and *the manner of acquisition* by W. J. Healey of this Healey Petroleum common stock. Healey acquired a total of 51,655 shares of the common stock the acquisition of which arose in the following manner: 10,000 shares were *paid* him as part consideration for the sale of the five properties, 38,155 shares were *given* him by reason of the provisions of the Hochstetter-Healey contract of November 19, 1928 which provided that W. J. Healey would receive 1 share of common stock for each unit (i.e., 1 share of preferred stock and 1 share of common stock) subscribed and 3500 shares were *purchased* by him between 1929 and 1942. When the recapitalization of Healey Petroleum took place in 1936, W. J. Healey, as an inducement to the preferred stockholders to exchange their stock for the debenture bonds, contributed back to the preferred stockholders 18,156 shares from his holdings; it is conceded that such shares were not subject to an accounting by the estate. Mrs. Greenan claims, and the court below held, that the estate must account for one-half of the balance of 33,139 shares (i.e., 51,655 shares less the 18,516 shares) or 16,569½ shares, valued at $62.50 per share[13] or $1,035,593.75. The thrust of the estate's argument is that, *to the extent that the court below considered in this balance of 33,139 shares any part of the 38,155 shares received under the November 19, 1928 contract,* the court erred.

It is the estate's contention that the 38,155 shares of stock represented *solely compensation* paid to W. J.

---

[13] The price at which the common stock was sold in 1948 to United Refining Company.

Healey for his services, past and future, rendered to Healey Petroleum for which no liability for an accounting exists. In disposing of this contention adversely to the estate, the court below did so on three grounds: (a) Finding of Fact No. 32, made at the time the court originally determined that a general accounting should be made, precludes this question now being raised; (b) W. J. Healey's skill and experience in the oil and gas business was an asset of Healey Oil and, since that partnership never terminated, W. J. Healey continued under an obligation to devote his skill and experience to that partnership; (c) the 38,155 shares of stock did not represent compensation for W. J. Healey's services but payment, in part, for the Hunt, Van Scoy, Buchanan, Forty-four and Shepard Run properties.

In its prior opinion directing the estate to file an accounting, the court made two separate findings of fact presently pertinent. Finding of Fact 32 stated: "In January and February of 1929 [Healey] received from [Healey Petroleum] for his own account for these properties $966,200 in cash, $500,000 face value of preferred stock of the corporation, and *47,940* shares of common stock of the corporation."[14] (emphasis supplied). Finding of Fact 24 stated: "[Healey Petroleum] was formed on November 30, 1928 and on December 3, 1928 [Healey] offered all his oil and gas producing properties in McKean County, Pennsylvania, to this new entity, which offer was accepted on that date to the end that a deed dated December 3, 1928, was prepared conveying all these properties including Shepard Run to [Healey Petroleum] in return for which [Healey] received 5,000 shares of $100 par value

_____

14 On the instant record this finding of fact, in at least one respect, is obviously incorrect. In "January and February of 1929" W. J. Healey received only 10,000 shares of common stock. W. J. Healey did not receive 38,155 shares of the common stock until November 1929 and December 1930.

preferred stock of [Healey Petroleum], *10,000* shares of no par common stock of [Healey Petroleum] and $965,000 in cash." (Emphasis supplied). Obviously, in regard to the number of shares of common stock transferred as *partial* consideration for the sale of the five properties, these two findings of facts are contradictory and incompatible and, furthermore, *only* Finding of Fact 24 is correct under the instant record as to the number of such shares. The court below believed that it was bound in *this* proceeding by Finding of Fact No. 32 in the *prior* proceeding. The *prior* proceeding was to determine whether *any* accounting had to be made by the estate whereas the present proceeding is to determine *the manner* in which such acounting should be made. The prior decree of the court below and our affirmation of that decree did not fix the precise or exact liability of the estate: *such is the purpose of the present proceeding.* In *Provident Trust Co. v. Rankin,* 333 Pa. 412, 418, 5 A. 2d 214, this distinction was recognized: ". . . It is only after an account has been stated and adjudicated that the respective liabilities of the parties and their estates can be determined. All that we now decide is that, under the agreement, appellant is required to account. The extent of the accounting, and the respective rights of the parties, must await determination until the account has been filed and adjudicated: [citing cases]". To the same effect: *Ringer v. Finfrock,* 340 Pa. 458, 17 A. 2d 348; *New Castle School District v. Travers,* 353 Pa. 261, 44 A. 2d 665. Many years ago this Court, in *Newbold v. Sims,* 2 S. & R. 317, 321, stated: ". . . when the parties came before the auditors, the account should be taken *according to the truth of the matter.*" (Emphasis supplied). In our view, Finding of Fact No. 32 in the prior proceeding does not preclude the estate from raising this question, particularly when it is so obvious that Findings of Fact 32 and 24 are at odds with each other and where the

record before the court in this accounting proceeding so clearly shows that Finding of Fact 24 reveals "the truth of the matter".

At the time of the formation of the Healey Oil partnership the parties agreed that W. J. Healey should be paid a $60 monthly salary for his services and at the end of six months this salary would be subject to readjustment, a readjustment which never took place. It is Mrs. Greenan's position that W. J. Healey's services constituted an asset of Healey Oil to which she, a partner, was entitled not only through 1928 but until the sale in 1948 of Healey Petroleum. So far as compensation is concerned, she appears to contend that, after the lapse of the six months period without readjustment of salary, Healey was entitled either to no compensation or compensation at $60 per month.

In *Rosenfeld v. Rosenfeld*, 390 Pa. 39, 45, 133 A. 2d 829, we recently said: "The law is clear that in the absence of an agreement to the contrary, a partner is not entitled to compensation beyond his share of the profits, for services rendered by him in performing partnership matters: [citing cases]. In the absence of a contract, a right to compensation arises only where the services rendered extend beyond normal partnership functions: [citing cases]." In the case at bar, there was a recognition that W. J. Healey was entitled to *some* remuneration over and above his share of profits and, as even the most cursory examination of W. J. Healey's services would reveal, his services extended far "beyond normal partnership functions". The entire management, direction and supervision of this partnership rested on W. J. Healey; Mrs. Greenan and Norman Healey either could not or would not assume the responsibility so W. J. Healey had to assume it. Under the factual situation portrayed so clearly on this record, to deny W. J. Healey any compensation or

limit him to $60 per month would be highly inequitable.[15]

At this point a distinction must be clearly noted. Mrs. Greenan's theory, upon which she seeks restitution from W. J. Healey's estate, is that W. J. Healey committed a fraud upon her and the Healey Trust in concealing the ultimate disposition of Healey Oil assets and thus depriving her and the trust of their fair share of profits arising from a successful employment of such assets. Mrs. Greenan does not—in fact, under this record, could not—contend that W. J. Healey did not devote his skill and efforts to the successful employment of the partnership assets, whether such employment took place under the aegis of Healey Oil or Healey Petroleum. In effect, what Mrs. Greenan is now urging is that, despite the skill and efforts of W. J. Healey which produced such very large profits from the partnership assets, W. J. Healey or his estate is not entitled to any compensation for such skill and effort because he had fraudulently concealed from her how successful were his efforts and that she was entitled to share in the fruits of such success. *Restitution, not punishment, is the goal of this proceeding.* To direct the restitution to Mrs. Greenan of the profits arising, in large part, from the employment of W. J. Healey's skill and efforts and to deny Healey *any* compensation or allow him only nominal compensation would be most inequitable. In *Brooks v. Conston,* 364 Pa. 256, 72 A. 2d 75, we stated (pp. 263, 264) : "While, ordinarily, a person guilty of fraud is not to be allowed profits or benefits derived therefrom in whatever form, we are of opinion that where, . . ., his services have greatly increased the value of the property which he fraudulently

---

[15] As the estate points out W. J. Healey's efforts increased Mrs. Greenan's original investment "from not more than seven thousand dollars to more than one million dollars—or, as [Mrs. Greenan] would say, more than six million dollars."

acquired, and the fruits of his management ultimately accrue to the rightful owner, an allowance may properly be made for the service rendered if, in the discretion of the court, *the circumstances in the particular case so warrant.*" (Emphasis supplied). See also: *East & West Coast Service Corporation v. Papahagis (No.1),* 344 Pa. 183, 187, 188, 25 A. 2d 339; *Tucker v. Tucker,* 370 Pa. 8, 16, 87 A. 2d 650. *The circumstances in the case at bar not only warrant but demand, if equity is to be accomplished, the allowance of reasonable compensation to W. J. Healey or his estate.*

Lastly, the court below took the position that the 38,155 shares did not *solely* represent compensation to Healey for services rendered to Healey Petroleum but "that the shares were turned over to [Healey] for a dual consideration: first, his undertaking to manage the corporation, and, second, his undertaking to transfer to the corporation all undeveloped leases which he then had and all leases which he might later acquire". To determine the propriety of this position of the court below we have examined three written instruments: the Hochstetter-Healey agreement of November 19, 1928, the stock subscription agreement and the Healey Petroleum agreement of December 21, 1928.

Our examination of these three written instruments indicates that the consideration for the issuance of the stock was clearly dual in nature: however, it is clear beyond question that, *in large part,* the consideration was compensation for W. J. Healey's services and, *to the extent that the 38,155 shares of the common stock represented such compensation,* credit should be given to the Healey estate.[16] The court below properly found that compensation for services was but one of two factors leading to the issuance of the 38,155 shares of com-

---

[16] In ascertaining the credit to be allowed, the salary paid to Healey while employed by Healey Petroleum must, of course, be given consideration.

mon stock. The court, however, erred in not giving Healey's estate *any* credit for compensation for Healey's services out of such common stock and the matter must be remanded to the court below that such credit may now be given.

The estate next urges that the court erred in its ruling on the sales of Healey Petroleum common stock by W. J. Healey to his children. Neither the *bona fides* of such sales nor the fact that the price obtained represented the market price when sold seem to be disputed. On September 15, 1944, 2364 shares were sold for $17 per share; on May 4, 1946, 1605 shares were sold for $26 per share; on May 10, 1946, 1021 shares were sold at $27 per share. The court below assumed that W. J. Healey had sold these 4990 shares for $62.50 each when Healey-Petroleum was sold to United Refining,[17] and charged the estate with the entire capital gain. Healey's estate claims it was overcharged in the amount of $217,-498. This claim lacks merit. The estate, in effect, urges that the shares sold by W. J. Healey to his family comes, in part, out of Mrs. Greenan's half of the common stock and that it is accountable only for the selling prices of such stock. The court below, in effect, held that the Healey estate must be deemed to have kept intact Mrs. Greenan's half of the common stock and that the shares sold by W. J. Healey to his family must be deemed to have been made from his own one-half of the stock. In so holding, *under the circumstances,* the court below did not err.

Finally, the estate contends that the court erred in allowing 6% interest on the amounts charged against the estate. The court below held that interest ran from the time "when sums were fraudulently withheld from [Mrs. Greenan] down to the date of ultimate pay-

---

[17] When this sale took place W. J. Healey still held 24,514 shares of common stock which he sold at $62.50 per share.

ment". An examination of the decree nisi,[18] wherein a schedule detailing the amount and manner of calculating the interest is incorporated, indicates that the interest charged ($2,329,655) exceeds by almost $25,000 the amount charged against the estate ($2,305,752). The court allowed interest, ranging from a maximum 46 8/12 years to a minimum 7 8/12 years, up to August 31, 1960. The estate challenges this allowance of interest.

*In partnership accounting the allowance of interest is not a matter of right but a matter of discretion* and ". . . the general rule appears to be that in the absence of an agreement to the contrary, interest is not to be allowed on partnership accounts until after a balance is struck, but may be charged if under the circumstances of the particular case the equities so require": 40 Am. Jur. §353, p. 378. In *Gyger's Appeal,* 62 Pa. 73, 79, Mr. Justice SHARSWOOD, speaking for this Court, characterized as "the safest principle to adopt in view of the confidential relation of the parties, and the variety and complication of such accounts" the rule that "the allowance or refusal of interest depends upon the circumstances of each particular case." See also: *Rehill v. McTague,* 114 Pa. 82, 7 A. 224. In *Goodwill v. Heim,* 212 Pa. 595, 597, 62 A. 24, this Court said: ". . . The general rule is that interest will not be allowed on partnership accounts until there has been a settlement of the same. It is true this court has frequently said that the allowance or refusal of interest in the settlement of partnership accounts depends upon the circumstances of each particular case: Gyger's Appeal, 62 Pa. 73; Grubb's Appeal, 66 Pa. 117; Jones v. Farquhar, 186 Pa. 386; Brenner v. Carter, 203 Pa. 75; Kelley v. Shay, 206 Pa. 215. . . . Interest should not be allowed on partnership accounts before there has been an accounting or settlement of the same, unless under

---

[18] Confirmed by the final decree.

the peculiar facts and circumstances surrounding the case the equities demand that interest be charged. In the case at bar we do not discover such peculiar facts or circumstances as would justify a departure from the general rule. There was no agreement to pay interest between the partners. No demand was made by the defendant for settlement of the account, the payment of balances, or for interest on the same before the bill was filed."

In our view, the allowance of interest prior to the date of the accounting in the case at bar was not justified. The action for accounting was not instituted until 38 years after W. J. Healey allegedly began his fraudulent concealment and then only after Healey had died, even though Mrs. Greenan, some 16 years prior thereto, alleging W. J. Healey had appropriated to himself partnership property, had instituted an action in New York State. While this record shows a fraud committed upon Mrs. Greenan, the purpose of this action is to restore to her that to which she was entitled but not to punish. In the case at bar, restitution to Mrs. Greenan will take practically all of Healey's estate; the interest allowed by the court would wipe out the estate. Under the instant factual situation, interest should run only from the date of the initial accounting, to wit, February 16, 1959 and to the extent that the court allowed interest prior to that date, the court erred. The decree of the court below must be modified to allow interest only from February 16, 1959.

## Mrs. Greenan's Appeal

In the first place, Mrs. Greenan complains because the court below allowed the Healey estate compensation for W. J. Healey's services to Healey Oil in the 1913-1928 period. The record indicates that, during that period, from the four properties—Hunt, Van Scoy, Shepard Run and Buchanan—profits of $434,902 were realized. In addition, when these four properties plus

Forty-four were sold to Healey Petroleum a capital gain was realized. Mrs. Greenan was credited by the estate with one-half of these profits plus the capital gain. From this source Healey Oil realized in actual profits and capital gain in excess of $1,500,000.

The court below allowed the estate a credit of $78,-520 as compensation for Healey's services. The court stated: "The [estate] contend[s] that [Mrs. Greenan] should be charged with $78,520 as her one-half share of $157,040 which is claimed as having been carried as 'reasonable compensation', due [Healey] for his services to the partnership. We believe it is undisputed [Healey's] management of the properties was valuable as shown by the growth of the partnership assets. [Mrs. Greenan] avers that under the law 'no partner is entitled to remuneration for acting in the partnership business unless otherwise agreed to by the members of a partnership.' [Mrs. Greenan] claims that the only agreement was to the effect that Mr. Healey was to receive $60 per month as salary with salary to be adjusted after 6 months as agreed. There is no evidence that a new agreement was made increasing the $60 payment. This Court feels it would be inequitable to not recognize the value of [Healey's] services and that [Mrs. Greenan] should allow a credit for one-half of the 'reasonable compensation,' claimed or $78,520." We have carefully examined the record and we are of the opinion that the court properly permitted this credit to the Healey estate. As we pointed out above, the fact that W. J. Healey may have been fraudulent in his dealings with Mrs. Greenan should not per se preclude him from reasonable compensation. That is the least which equity requires in the instant situation.

In the second place, Mrs. Greenan claims she is entitled to a one-half share of salaries paid to W. J. Healey by W. J. Healey & Co., Atlas Oil Company and Healey Petroleum between 1929 and 1950. Between

1925-1928 Healey was paid a total of $1600 by Healey & Co., in 1935, $3600 by Atlas Oil and, from December 1928 to July 1948, $142,642 by Healey Petroleum, the total salaries being $147,842. On the theory that these salaries were profits of the family partnership Mrs. Greenan claims one-half share thereof. As an example of the extent to which Mrs. Greenan claims her "pound of flesh" the claim as to Atlas Oil is illustrative. W. J. Healey, between 1933 and 1937, purchased 651 shares of Atlas Oil for $60,069.96. Although he served as president of Atlas Oil for *nine* years he was paid a salary—$3600—for only *one* year. Dividends he received totalled $71,144.99 and when his stock was sold a net capital gain of $78,799.67 was realized. In its account the estate credited to Mrs. Greenan one-half of *both* the dividends and the capital gain or $74,972.34. Mrs. Greenan now wants, in addition, one-half Healey's salary of $1800!!

So far as Healey's Petroleum's salary paid to W. J. Healey we have stated that, in our view, W. J. Healey was entitled to compensation for his services and such compensation included the salary paid him which averaged slightly more than $7000 per year. In Mrs. Greenan's claim there is no merit whatsoever. Certainly the old adage that "the laborer is worthy of his hire" (1 Timothy V:18, Luke X:7) applies to the instant factual situation where a sister is willing to accept *all* the benefits of her brother's services and would not only deny him adequate compensation for such services but seek to share in any such compensation. This claim was most properly disallowed.

Mrs. Greenan's final complaint is that the court should have required the estate to account for one-half share of the profits realized by W. J. Healey and members of his family from ten[19] companies engaged in

---

[19] Healey Drilling Co., Abbott Drilling Co., Hudson Drilling Co., Russell Drilling Co., Hillside Drilling Co., Star Drilling Co.,

*drilling* oil wells and from an eleventh[20] company which owned interests in contract *drilling* companies. Of these eleven companies—all partnerships—ten were engaged in *drilling* oil wells on lands owned or leased by oil producers for fixed contract prices and one was a partnership, owned by W. J. Healey, his wife and six children, which simply owned interests in other *drilling* partnerships. Of the ten "operating" partnerships W. J. Healey owned an interest in seven, two of his children owned interests in three and a trustee for his grandchildren owned interests in four. Between 1925 and 1950 W. J. Healey realized profits from these partnerships of $448,524 and members of his family between 1935 and 1950 realized $908,255. Of these profits Mrs. Greenan claims a one-half share.

The stated purpose of the Healey Oil partnership—the source of *any* interest which Mrs. Greenan may have—was that "of operating and producing oil and gas". Mrs. Greenan contends that "drilling operations" were within that purpose. The record indicates that *drilling oil wells* requires special equipment, experience and skill and that the *drilling of oil wells* is ordinarily performed by drilling contractors who enter into contracts to dig wells for owners or lessors of land classified as oil producing. The distinction between the business of "operating and producing oil and gas" and that of "drilling" is sharply drawn on this record and it is clear beyond question that the nature of the business of the drilling partnership was entirely different from the nature of the business in which J. H. Healey, Healey Oil and Healey Petroleum engaged. A scrutiny of this record is convincing of the correctness of the conclusion reached by the court below, i.e., "that the business of drilling oil wells for others under contract was [not]

---

Church Drilling Co., Charles Nelson & Co., Rice Drilling Co. and Star Spudding Co.

[20] W. J. Healey Shares.

within the scope of [Healey Oil] partnership." Mrs. Greenan has no claim to any of the profits from these eleven partnerships.

In summary, we are of the opinion: (1) that the Healey estate is entitled to claim compensation for W. J. Healey's services to Healey Petroleum and, *to the extent that the 38,155 shares given to Healey represent compensation,* the estate should be given credit and the decree of the court below which failed to allow *any* credit for such compensation is erroneous; (2) that sales of the common stock made to W. J. Healey's children by Healey must be considered as consisting of W. J. Healey's own, rather than Mrs. Greenan's share, of the stock and the decree charging the estate with the entire capital gain realized from this stock was proper; (3) that the allowance of interest from 1913 to August 31, 1960 was erroneous and interest should have been allowed only from February 16, 1959, and, therefore, the decree must be modified in that respect; (4) the allowance of compensation for W. J. Healey's services to Healey Oil as a credit to the estate was proper; (5) the disallowance of Mrs. Greenan's claim to share in salaries paid to W. J. Healey by W. J. Healey & Co., Atlas Oil and Healey Petroleum was proper; (6) that the court properly refused to require the estate to account for a share in profits realized by Healey and his family from the drilling partnerships.

Decree, as modified, affirmed. The record is remanded for the purpose of proceeding in accordance with the views expressed in this opinion. Each party to pay own costs.