TRUE OIL COMPANY, a Wyoming partnership, Appellant (Plaintiff),

v.

SINCLAIR OIL CORPORATION, a Wyoming corporation, Appellee (Defendant).

SINCLAIR OIL CORPORATION, a Wyoming corporation, Appellant (Defendant),

v.

TRUE OIL COMPANY, a Wyoming partnership, Appellee (Plaintiff).

Nos. 86–151, 86–187.

Supreme Court of Wyoming.

March 24, 1989.

Rehearing Denied May 8, 1989.

Richard E. Day and Houston G. Williams of Williams, Porter, Day & Neville, P.C., Casper and R. Stanley Lowe and John J. Blomstrom of True Oil Co., Casper, for True Oil Co.

V. Anthony Vehar and Roy A. Jacobson of Vehar, Beppler, Jacobson, Lavery & Rose, Kemmerer, Rene P. Lavenant, Jr. and M.W. Parse, Jr. of Fulbright & Jaworski, Houston, Tex., and Peter M. Johnson of Sinclair Oil Corp., Salt Lake City, Utah, for Sinclair Oil Corp.

Before CARDINE, C.J., and THOMAS, URBIGKIT, and MACY, JJ., and BROWN, J., Retired.*

URBIGKIT, Justice.

We consider an appeal and cross-appeal from the trial court determination of rights, interests, and obligations arising from an agreement to drill an expensive and unsuccessful exploratory wildcat oil well in the northern overthrust belt of western Wyoming.

The agreement, initially orally and later reduced to writing, was negotiated between the two individuals—H.A. (Dave) True, Jr. for True Oil Company (True Oil), appellant/cross-appellee, plaintiff below, and Robert Earl Holding for Sinclair Oil Corporation (Sinclair Oil), appellee/cross-appellant, defendant below. In the course of lengthy and very costly drilling efforts, Sinclair Oil became disenchanted with the project and terminated its participation in the contribution to well costs. Litigation ensued, the well was abandoned and acreage interests earned by the unsuccessful drilling were resold to Exxon Corporation, Atlantic Richfield Company and Shell Oil Company (Telephone Pass Group) for a modest cash payment and a five percent overriding royalty. Upon appeal, we are asked to review the trial court's determination of the parties' respective rights and obligations under the terms of their agreement for contribution to drilling cost and division of the cash payment and royalty upon sale of acreage interests earned by well drilling. We analyze the effect of going non-consent during the drilling operation.

## I. ISSUES

Appellant, True Oil, phrases the issues as:

I. Did Sinclair have the right to abandon the Deadman well on September 10, 1982?

A. What was the effect of Sinclair's abandonment of the Deadman well on September 10, 1982?

II. The trial court erred as a matter of law in construing the agreement between the parties to find a verbal agreement that the Deadman well was to be drilled at "Dave True's Cost."

A. There is insufficient evidence to support the trial court's finding of a verbal agreement between the parties that the Deadman well would be drilled at "Dave True's Cost."

B. Sinclair is estopped from claiming a cost basis other than competitive prices. Sinclair, by its actions, has waived its claimed right under the agreement to have costs based upon anything but competitive prices.

III. The court erred in disallowing rig and camp costs and fuel cost without profit.

A. There was nothing improper in True Oil contracting with its affiliates to furnish a part of the equipment and services for the Deadman well at competitive prices.

B. The trial court, by the trial and post-trial procedures adopted by it, denied True Oil a fair trial.

C. There is sufficient evidence in the record to permit the court to determine cost without profit of rigs 17 and 24.

---

* Retired June 30, 1988.

IV. The court erred as a matter of law in finding that Sinclair had earned full rights under the terms of the Deadman/Telephone Pass Exchange agreement and agreement.[1]

Cross-appellant, Sinclair Oil, questions:

1. Is Sinclair entitled to recover back from True $720,173 in monies advanced by Sinclair to True as Sinclair's share of the costs of the joint venture for which True has failed to properly account[?]

2. Is Sinclair entitled to recover back from True the sum of $65,758.50 being the twenty-five percent charged to Sinclair of profit margins of $69,256 enjoyed by Black Hills Trucking Company and $193,778 enjoyed by Tool Pushers Supply Company, because Mr. True agreed to operate at his own cost and without profit and because by reason of his ownership of these corporations those profit margins were of personal benefit to him and his family? [2]

Our resolution of the issues raised initially by True Oil effectively disposes of the issues raised in the cross-appeal; therefore, they will not be addressed separately. We affirm in part, reverse in part, and remand.

## II. FACTS

In the midst of the oil and gas exploration boom of the late 1970's and early 1980's, considerable interest arose in the geological area in western Wyoming described as an extension of the Overthrust Belt, within which major discoveries of oil and gas producing fields had been made. True Oil and its managing partner, H.A. "Dave" True, Jr. (Dave True), had for some time been interested in the oil and gas potential of this hot area because seismographic studies indicated a significant deflection in the area of the Basal Plate (subthrust) of the Madison Formation, estimated to be located at a depth of 15,000 to 18,000 feet. The deflection was believed to indicate a geological formation capable of containing a huge deposit of hydrocarbons similar to other earlier discoveries further south in Wyoming and Utah.

True Oil obtained exploration rights to a large block of federal land in the area by acquiring farmout and acreage contribution agreements from third party oil companies holding the federal leases. True Oil formed the land into a 24,714.87 acre feder-

1. Appellee, Sinclair Oil, somewhat differently characterizes these issues as:

 1. Did the trial court commit reversible error (a) in finding that the parties to the joint venture had not agreed to drill or participate in the costs of drilling the initial test well to any particular depth or formation, or (b) in finding and holding that as a consequence Sinclair did not breach the joint venture agreement when Sinclair, in good faith and in the exercise of its own best business judgment after several months of watching money being poured down a hole in fruitless fishing operations, elected to spend no more money in attempts to deepen the well. * * *

 2. Did the trial court commit reversible error in construing the written joint venture agreement to the effect: (a) that it did not authorize True, as the co-adventurer who managed and conducted the joint venture, to enjoy undisclosed profits at the expense of Sinclair and did not derogate from True's fiduciary duty to abstain from taking such profits? * * *

 3. Did the trial court commit reversible error in failing to *excuse* True, under the equitable doctrines of waiver or estoppel, from its duty to account for such secret profits, where (a) Sinclair was wrongfully induced to invest $2.5 million in the joint venture on

the basis of misrepresentations made by True to Sinclair, and (b) the conduct of Sinclair relied upon to establish the waiver and estoppel was the failure of Sinclair to raise the issue at a time earlier than Sinclair did raise it?

 4. Did the trial court commit reversible error by its allocation of the burden of proof and the burden of going forward with the evidence so as to deny True an opportunity to prove its case?

 5. Did the trial court commit reversible error in declining to exercise its equitable power to declare Sinclair's share of the oil and gas rights in the entire Deadman Unit forfeit, where the ground relied upon to justify the forfeiture was Sinclair's election to invest no further monies in an attempt to deepen the well under the circumstances then existing?

2. Cross-appellee, True Oil, describes these issues as:

 A. Sinclair is not entitled to the return of any monies.

 B. Was the trial court correct in its holding that Sinclair was not entitled to judgment on any portion of the charges made by the corporations, Toolpushers Supply and Black Hills Trucking?

al unit (known as the Deadman Unit) in the fall of 1978, receiving approval of the federal unit agreement and unit operating agreement. Under these agreements, True Oil was the designated operator, and provision was made for an initial test well. In 1979, True Oil built a road, prepared a location, spudded a well, and set conductor pipe.

Seeking additional participants in the project, Dave True approached Sinclair Oil. True Oil, for tax purposes, desired to establish a kitty for drilling costs with cash advances made by the participating parties before the end of 1979. Sinclair Oil, through Robert Earl Holding (Earl Holding), expressed an interest and further discussions and meeting occurred between the principals and representatives of the two companies. During the negotiations, Earl Holding stressed that he was interested only if the project were done "at cost." Dave True indicated that this was agreeable, that there would be no "front-end loading" or "promotion" charged to Sinclair Oil. The meaning of the phrase "at cost" as understood and communicated between the parties was a primary issue at trial and is a central issue for appeal.

Although much of the testimony conflicted as to what was discussed during these negotiations, it is reasonably clear that the parties understood that the primary objective of the well was the sub-thrust of the Madison Formation, with the opportunity to test intermediate horizons at lesser depths. It was also understood that it would be a two drilling season project, and that the well would be an expensive rank wildcat, but that the reservoir potential was high and the participants would earn leasehold interests under the constituent farmout acreage to depths reached by the test well.

In late December 1979, True Oil and Sinclair Oil reached an oral agreement for mutual participation in this Deadman Unit oil play, with Sinclair Oil advancing $2.5 million to True Oil as one-half of the joint $5 million kitty. Drilling commenced in June 1980 and the oral agreement was later reduced to writing in a draft prepared by True Oil in the spring of 1980 and, after modification, executed by the parties in August 1980. This "Deadman Agreement" provided generally that in return for Sinclair Oil's fifty percent cost participation in the drilling costs, Sinclair Oil would receive a fifty percent interest in the well production and share equally in the acreage earned under the farmout agreements.

True Oil, as operator responsible for drilling operations, engaged the services and equipment of various affiliated companies. True Drilling Company was the drilling contractor, True Leasing Company provided a rig camp, Eighty–Eight Oil Company supplied the fuel, Toolpushers Supply Company furnished various equipment including tubular goods, and Black Hills Trucking did the hauling to and from the location. True Drilling Company, True Leasing Company, and Eighty–Eight Oil Company are all partnerships comprised of the same partners as True Oil. Black Hills Trucking and Toolpushers Supply Company are Wyoming corporations whose stock is principally held by True family members. Dave True is the chief executive of each entity, although each has separate management, employees, business dealings and fiscal years.

The initial drilling phase was accomplished in 1980 by True Drilling Company, reaching a depth of 10,286 feet at which point operations were suspended for the winter. For the second drilling season, a larger rig capable of deeper drilling was needed to satisfy the farmout and contribution agreements. True Drilling Company ultimately purchased the required rig. True Oil paid True Drilling Company $2.5 million for its share of the advance day work payments to secure this new rig, and Sinclair Oil was asked to pay another $2.5 million for its share. Although Sinclair Oil responded that it "would certainly consider the necessity of paying this invoice very promptly," the billing was never paid. Nevertheless, True Drilling Company purchased the larger rig and moved it onto the location at the Deadman well in August 1981.

During the fall of 1981, drilling difficulties were encountered as the second rig attempted to deepen and then ream the hole to a larger diameter. Costs of drilling were considerably higher than they had been the year before. In the late fall, Sinclair Oil became concerned about mounting costs and the fact that its prepayment was or would soon be exhausted. In November 1981, Sinclair Oil advised True Oil that they wished to "lay-off" one-half of its interest, preferably to a third party, to limit its liability exposure. Consequently, True Oil orally agreed to assume one-half of Sinclair Oil's interest and obligations, thereby reducing Sinclair Oil's participation to twenty-five percent and increasing True Oil's to seventy-five percent. A telex confirming True Oil's agreement to assume one-half of Sinclair Oil's interest in the well was sent to Sinclair Oil on December 31, 1981. Subsequently, the "Deadman Agreement Amendment" reflecting the new percentages was drafted and executed by the parties effective retroactively to the original date of the Deadman Agreement.

Drilling continued through the winter and into the spring of 1982. After a loss of tools in May, expensive fishing operations commenced and continued unsuccessfully through the summer. At the same time in 1982, as incurred well costs grew, the oil boom was ending with drilling activity in decline, day rates charged by drilling contractors and charges by other service suppliers spiralled downward.

On August 12, 1982, the parties met to consider the unsuccessful fishing operations, continuing costs and oil industry decline. Sinclair Oil, for the first time, expressed concern to True Oil over rig costs and inquired if they could be reduced. After agreeing to look into the matter, True Oil advised Sinclair Oil in early September that any reduction in costs would be minimal. As a result, Sinclair Oil decided to "pull the plug," which terminated its participation. On September 10, 1982, Sinclair Oil notified True Oil of its decision by telex, that it was "going non-consent" as to further participation in drilling costs.[3] As an alternative, Sinclair Oil offered to accept a further reduction in interest in the venture equal to an apportionment of the percentage of final total costs divided by its $2.5 million prepayment. As of September 10, 1982, drilling costs had totaled $12,682,588, and the well had reached a depth of approximately 11,665 feet. True Oil, believing that to realize any value from the well required continued drilling, advised Sinclair Oil that by refusing to participate further in costs, Sinclair Oil would forfeit its interest in the project.

True Oil continued drilling until June 1983, incurring additional costs of over $8 million in deepening the hole to a depth of 13,598 feet. On June 10, 1983, True Oil and Sinclair Oil entered into the Deadman/Telephone Pass Exchange Agreement for sale of their interests in the unit to the Telephone Pass Group.[4] The buyers paid True Oil $412,500 and Sinclair Oil $137,500, computed from the seventy-five/twenty-five percent division provision of the amended Deadman Agreement, and granted them jointly a five percent overriding royalty. Pursuant to the Deadman/Telephone Pass Exchange Agreement, the well was plugged and abandoned and the area reclaimed by True Oil.

This litigation was first commenced in January 1983 by True Oil with its complaint later amended after execution of the Deadman/Telephone Pass Exchange Agreement. By complaint and amended complaint, True Oil alleged Sinclair Oil breached a written and oral agreement to participate in drilling the Deadman Well to

---

3. Sinclair Oil found authority to withdraw based on its interpretation of the non-consent provisions of the Unit Operating Agreement. Although Sinclair Oil was not a party to the Unit Operating Agreement, the Deadman Agreement provided that operations would be conducted in accordance with the Unit Operating Agreement except as otherwise provided in the Deadman Agreement and the farmout agreements.

4. Although True Oil was asserting a forfeiture by Sinclair Oil in litigation already commenced, the Telephone Pass Group, knowing of Sinclair Oil's contractual interest in the Deadman Unit, insisted Sinclair Oil be made a party to this agreement.

the Basal Plate of the Madison Formation and claimed damages of $2,237,613, which was the amount allegedly representing twenty-five percent of the total incurred drilling cost through June 10, 1983 in excess of Sinclair Oil's initial $2.5 million contribution. As a further claim, True Oil sought a declaratory judgment that Sinclair Oil, by withdrawing from cost participation in September 1982, had forfeited all rights to participate in the payment or acreage interest received from the Telephone Pass Group.

By its answer, amended answer, counterclaim and amended counterclaim, Sinclair Oil denied any agreement to drill to a certain depth, alleged that True Oil misrepresented the cost of the project in inducing Sinclair Oil's participation, and contended that by cost overcharge, True Oil breached their agreements. Sinclair Oil pursued recovery for those alleged overcharges, asked for punitive damages, and sought a declaration of a twenty-five percent Deadman/Telephone Pass Exchange Agreement entitlement. Alternatively, Sinclair Oil sought rescission of the entire Deadman Agreement with a total refund of the $2.5 million plus interest.

The trial of this matter commenced on June 24, 1985 and continued through July 8, 1985. Sinclair Oil, at the close of True Oil's case in chief, filed a written motion to dismiss. This motion was based in part on Sinclair Oil's allegation that True Oil had not sustained its burden of proof as to the propriety of charges to the joint account.[5] The trial court reserved a ruling on the motion and the trial proceeded. At the trial court's request, written closing arguments were submitted after the trial. In its written closing argument, Sinclair Oil adopted the position that under the parties' agreement, True Oil could only bill the joint account for the services provided by the affiliated companies at the affiliates' cost which would constitute "Dave True's cost."

## III. DECISION OF THE TRIAL COURT

The trial court issued its decision letter in November 1985 finding and concluding, inter alia, that:

1. True Oil, in conducting operations, was acting as Sinclair Oil's agent in a fiduciary capacity.

2. The agreement was one at will entitling Sinclair Oil to withdraw from participation on September 10, 1982, but that Sinclair Oil was liable for its principal share of costs incurred to that date.

3. The Deadman Agreement was not ambiguous, and the parties had agreed to drill the well at "Dave True's cost." Therefore, the partnership affiliates were not entitled to any profit, although the corporate affiliates, as separate entities, were entitled to a profit.

4. As an alternative basis if the Deadman Agreement was found to be ambiguous, an examination of the extrinsic evidence showed that the parties intended that True Oil was not to enjoy any profit except interest on the advance in drilling the well.

5. Of the total charges to the joint account as of September 9, 1982 of $12,682,588, True Oil failed to properly account for $5,563,279 [6] by not proving

5. Sinclair Oil was at this point alleging that True Oil was required to comply with provisions in the Accounting Procedure that was attached to and incorporated into the Unit Operating Agreement regarding owner operated equipment. These provisions limited operators, using operator owned equipment, to charging the joint account competitive prices minus twenty percent or cost plus eight percent. Alternatively, Sinclair Oil alleged that True Oil was required to justify its charges on a showing of quantum meruit based on the value to Sinclair Oil of the services furnished.

6. This figure reflects the total disallowances of:

1. $1,065,082 for charges from True Drilling Company on the smaller rig;
2. $3,788,007 for charges from True Drilling Company on the larger rig;
3. $190,350 for charges from True Leasing Company for the camp rental;
4. $32,677 for charges from Eighty–Eight Oil Company for profit on the fuel;
5. $326,307 for charges allegedly attributable to the pre-September 10, 1982 period, but not invoiced to Sinclair Oil;
6. $99,096 for miscellaneous audit exceptions to Sinclair Oil; and

or improper charging. The lack of proof was directed to non-separation of profit and insufficient evidence. Therefore, True Oil's claim for twenty-five percent of any amount must fail.

6. True Oil properly accounted for $7,119,309 [7] in charges to the joint account through September 10, 1982 and that Sinclair Oil's twenty-five percent share thereof is $1,779,827.

7. Sinclair Oil's prepayment of $2.5 million exceeds its twenty-five percent share of properly established charges of $1,779,827. Therefore, Sinclair Oil is entitled to recover $32,943, representing twenty-five percent of certain admitted or demonstrated improper charges. However, Sinclair Oil is not entitled to recover the balance of the unaccounted for charges of $687,230 because "it would be speculation on the part of the Court to attempt to determine whether Sinclair is entitled to recover any portion of this sum."

8. The parties are entitled to share in the money and royalty interest received in the Deadman/Telephone Pass Exchange Agreement on a seventy-five/twenty-five basis.

The initial trial court decision regarding allocation of costs reflected an apparent determination that there was a failure of proof by both parties. Following the trial court's decision, True Oil filed various motions and letters seeking to reopen the case for introduction of evidence regarding True Oil's costs without profit to the partnership affiliates. At one point, the trial court issued an Order Granting Motion to Dismiss and Order Partially Reopening Case. This combined order granted Sinclair Oil's earlier motion to dismiss as far as the failure of proof as to proper rigs and camp expenses charged by True Drilling Company and True Leasing Company, respectively. Simultaneously, the trial court offered to partially reopen True Oil's case for sub-

mission of an offer of proof as to these affiliate charges without profit. Subsequently, upon determining that True Oil had not made the requested offer of proof, the trial court vacated the order partially reopening. Findings of Fact, Conclusions of Law and Final Judgment were dispositively entered on May 6, 1986, and this appeal followed.

## IV. STANDARD FOR REVIEW OF THIS CONTRACTUAL ACTION

■ We begin by observing, as did the trial court, that this case represents an action on a written contract entered into by knowledgeable participants for a profit and in good faith. Thus, resolution of the issues presented requires that we look to the terms of the written instrument, the Deadman Agreement, and where necessary, apply our established principles of contract interpretation and construction. We further note that this case involves both factual issues and questions of law. Our standard of review of factual issues is whether or not substantial evidence supports the findings of the trial court.

Our rule is that where the sufficiency of evidence is an issue we uphold the judgment if there is evidence to support it, and in so doing we look only to the evidence submitted by the prevailing party and give to it every favorable inference which may be drawn therefrom, without considering any contrary evidence.

*Hance v. Straatsma*, 721 P.2d 575, 578 (Wyo.1986). See also *NL Industries, Inc. v. Dill*, 769 P.2d 920 (Wyo.1989); *Eddy v. First Wyoming Bank, N.A.–Lander*, 750 P.2d 294 (Wyo.1988); *Ruby Drilling Co., Inc. v. Title Guar. Co. of Wyoming, Inc.*, 750 P.2d 674 (Wyo.1988); and *Tremblay v. Reid*, 700 P.2d 391 (Wyo.1985). Conversely, on questions of law, we accord no spe-

7. $61,760 for charges concerning drill bits allegedly used post-September 10, 1982 and transportation expenses of the smaller rig.

7. This figure represents the total of:
 1. $6,856,275 for charges admitted by Sinclair Oil;
 2. $69,256 for charges for profit to Black Hills Trucking; and
 3. $193,778 for charges for profit to Toolpushers Supply Company.

cial deference to and are not bound by a trial court's decision. *Farr v. Link,* 746 P.2d 431 (Wyo.1987); *Griffin v. Bethesda Foundation,* 609 P.2d 459 (Wyo.1980); *Matter of North Laramie Land Co.,* 605 P.2d 367 (Wyo.1980).

## V. RIGHT TO WITHDRAW FROM COST PARTICIPATION

■ True Oil first contends that the trial court committed error in finding that Sinclair Oil could withdraw from cost participation in the Deadman well on September 10, 1982. This contention is premised on True Oil's argument that the parties had contractually agreed to attempt to drill to the Basal Plate of the Madison Formation, that Sinclair Oil was obligated to contribute to the costs of the well until time of abandonment in June 1983, and that when Sinclair Oil went non-consent to withdraw from cost contribution, it breached the Deadman agreements.

We disagree. The finding by the trial court, supported by substantial evidence, that True Oil had effectively conceded this issue by its own evidence at trial, is dispositive on this appeal of the case. The testimony of several witnesses indicated that the parties had contemplated the sub-thrust (Basal Plate) of the Madison Formation as an "objective" of the drilling program. The absence of any understanding of a binding obligation to contribute to drilling costs to such depths is clearly illustrated in this examination of Dave True by the trial court during trial:

THE COURT: Mr. True, it was your understanding of the agreement that True Oil Company was obligated to go to the subthrust of the Madison formation, is that correct?

THE WITNESS: Your Honor, I don't know as if I agree with the word obligated because—

THE COURT: Promise?

THE WITNESS: If it was an obligation, then we would have a definite limitation. It was an objective.

THE COURT: Was it your understanding that Sinclair was obligated to pay clear to the subthrust of the Madison?

THE WITNESS: No, sir. It was my understanding that Sinclair shared True Oil Company's objective of getting to the Madison.

THE COURT: Well, did True—was it your understanding that True Oil Company had promised—

THE WITNESS: No, sir.

THE COURT:—to continue drilling until it hit the subthrust of the Madison formation?

THE WITNESS: No, sir. As a matter of fact, I tried to—

THE COURT: Was it your understanding that it was Sinclair's obligation to keep paying until you hit the subthrust of the Madison formation?

THE WITNESS: No, sir.

Additionally, during cross-examination of Dave True, this exchange occurred:

Q. I think you've said earlier that you don't question Sinclair's right to quit on September 10, 1982, but the consequences of their quitting was a forfeiture, then, of any interest that they might have?

A. That has been my experience over the years, yes, sir.

Furthermore, the written agreement is devoid of language indicating an unqualified obligation to contribute to drilling costs to the sub-thrust. The pertinent provisions of the contract provide:

True agrees, as soon as weather permits in the Spring of 1980, to move in a rotary rig and diligently pursue drilling operations as long as weather conditions permit during 1980. True further agrees to continue diligently, as drilling season controlled by weather conditions permit, to drill the well to the *ultimate depth agreed upon by the parties.* As a minimum, True will diligently attempt to drill the well to the depth required to satisfy the Farmout Contracts described above. [Emphasis added.]

A subsequent provision of the contract provides:

Further, it is agreed that all costs of drilling, testing, completing and operating the initial test well until payout is reached as defined in the Farmout Agreements, * * * shall be borne in the following proportions:

True _____50%

Sinclair _____50% [8]

The trial court found that under the contract, each party had the right to stop contributing to costs of the well at any time, or at least after November 1980 when the well had reached a depth of 9,000 feet as called for in some of the farmout agreements. The trial court concluded that this was an agreement at will which contemplated that the parties would agree upon the ultimate depth of the well. This conclusion is an appropriate analysis of the written contract.

 Our rules of contract construction are well-established. The determination of the parties' intent is our prime focus in construing or interpreting a contract. *State v. Moncrief,* 720 P.2d 470 (Wyo.1986); *Amoco Production Co. v. Stauffer Chemical Co. of Wyoming,* 612 P.2d 463 (Wyo. 1980). "If an agreement is in writing and the language is clear and unambiguous, the intention is to be secured from the words of the agreement." *Nelson v. Nelson,* 740 P.2d 939, 940 (Wyo.1987). See also *Kost v. First Nat. Bank of Greybull,* 684 P.2d 819 (Wyo.1984). When the language is clear and unambiguous, the writing as a whole should be considered, taking into account relationships between various parts. *Kost,* 684 P.2d at 823; *Rouse v. Munroe,* 658 P.2d 74 (Wyo.1983). Contract construction and interpretation are done by the court as a matter of law. *Amoco Production Co.,* 612 P.2d at 465; *Bulis v. Wells,* 565 P.2d 487 (Wyo.1977).

 If the contract is ambiguous, the intent of the parties may be determined by resort to extrinsic evidence. *Rouse,* 658 P.2d at 78; *Mountain Fuel Supply Co. v. Central Engineering & Equipment Co.,* 611 P.2d 863 (Wyo.1980). An ambiguous

contract is one "which is obscure in its meaning because of indefiniteness of expression or because of a double meaning being present." *Farr,* 746 P.2d at 433. See also *Bulis,* 565 P.2d at 490. The existence of ambiguity is a question of law. *Hensley v. Williams,* 726 P.2d 90 (Wyo. 1986); *Amoco Production Co.,* 612 P.2d at 465.

After analysis of the provisions of the Deadman Agreement, we agree with the trial court that neither party was unreservedly obligated to participate in drilling costs to the sub-thrust of the Madison Formation, whatever those costs might total. The provision that the parties agree to drill to the "ultimate depth agreed upon by the parties" is inherently indeterminate as reserving a right to stop. The testimony of Dave True supplements this interpretation to sustain our conclusion that neither party intended to irretrievably continue to be obligated to pay costs until drilling reached that depth. Therefore, we hold by application of the terminology of the agreement itself that Sinclair Oil had the right to withdraw from cost participation in the well on September 10, 1982 without causing a breach in its Deadman well participation. The converse of this holding, however, is that Sinclair Oil is liable for its share of the proper costs of drilling until it went non-consent on September 10, 1982, a point not contested by Sinclair Oil. The method of determining such costs, and the effect of Sinclair Oil's withdrawal for division of the consideration received from the Deadman/Telephone Pass Exchange Agreement are at issue, and their resolution will comprise the balance of this opinion.

## VI. DRILLING THE WELL "AT COST"

A. Costs to partnership affiliates—True Drilling Company, True Leasing Company and Eighty–Eight Oil Company.

 The second major issue of this litigation arises within the True Oil contention

8. Of course, the fifty/fifty split was changed to seventy-five/twenty-five in the amended Dead- man Agreement.

that the trial court committed error in construing the agreement between the parties requiring the well to be drilled at "Dave True's cost" rather than True Oil's cost. The effect of this disallowance was denial of profit to the affiliated partnership companies who provided services and equipment to True Oil, the designated operator.

In this regard, we agree with True Oil. In resolving this issue, it is necessary to again look to the terms of the Deadman Agreement and similarly apply contract application and interpretation principles. The parties in the agreement were designated by provision:

> This agreement entered into this 31st day of December, 1979, by and between True Oil Company, P.O. Drawer 2360, Casper, Wyoming 82602, herein called "True," and Sinclair Oil Corporation, P.O. Box 1677, Englewood, Colorado 80150, herein called "Sinclair," and collectively referred to as "Parties."

The provision allocating costs provided:

> Further, it is agreed that all costs of drilling, testing, completing and operating the initial test well until payout is reached as defined in the Farmout Agreements, including costs of forming the Unit, acquiring access to location, building roads and location, moving in and out a spudder and any other related operations shall be borne in the following proportions:
>
> True .........50% [amended to seventy-five percent]
>
> Sinclair ......50% [amended to twenty-five percent]

The agreement was executed in this fashion:

> Executed this 31st day of December, 1979.
>
> SINCLAIR OIL CORPORATION
>
> By: /s/ R.E. Holding
>
> President
>
> TRUE OIL COMPANY

By: /s/ H.A. True, Jr.

H.A. True, Jr., Partner

In reading these provisions together, it is clear that the contract was made and executed between Sinclair Oil and True Oil. Dave True, as an individual, was not a party to the contract, nor was the drilling contractor, True Drilling Company, nor were any other of the affiliated companies. See *WNB–Gillette v. Davis*, 770 P.2d 215 (Wyo.1989), differentiating between proceeding against a partner individually and as a partner. We do not agree with the trial court interpretation of these provisions as prohibiting the affiliated partnership companies from including a profit element in their service and equipment contracts with True Oil. A realistic reading of the terms indicates the well was to be drilled at the cost to True Oil, and such cost was to be shared by the parties according to their respective interests. If a net out billing limitation for other entities and all affiliates was expected, it should have been recited within the written agreement terms.

We do find, nevertheless, that the terms of the contract on this issue are somewhat vague and indefinite, thus ambiguous, so that resort to extrinsic evidence is appropriate to establish the intent of the parties when the contract was made. *Rouse*, 658 P.2d at 78. We observe that, in the preliminary negotiations, Earl Holding, representing Sinclair Oil, indicated to Dave True, representing True Oil, that he was only interested in the project if it was done at cost. Dave True agreed and stated there would be no "front-end loading" or "promotion" devices by which a nonoperator (Sinclair Oil) pays a greater share of development and exploration costs than the operator (True Oil) in relation to their earned interest.[9]

Although Earl Holding testified that he understood the project was to be done at Dave True's cost and Dave True testified

---

**9.** Testimony in the record indicates that agreements between operators and non-operators providing for promotion and front-end loading are not uncommon in the oil exploration industry. Under such an agreement, the non-operator pays a greater percentage of the exploration costs in relation to the percentage interest he receives in the project, thereby providing the operator an incentive for managing operations. For example, a non-operator may pay two-thirds of the costs for a realized one-half interest in the project.

that it was to be done at True Oil's cost, we believe the intent of the parties can most reliably be ascertained by their conduct in relation to the contract.

It is well settled that, if the meaning of a contract or instrument is doubtful on its face, the practical construction put upon it by the parties should have great weight in determining its proper construction. * * * This is especially true where the parties have for a long time acquiesced in, and acted in good faith upon, such practical construction.

*Rohrbaugh v. Mokler,* 26 Wyo. 514, 188 P. 448, 450 (Wyo.1920). See also *Sunburst Exploration, Inc. v. Jensen,* 635 P.2d 822, 825 (Wyo.1981); *P & M Cattle Co. v. Holler,* 559 P.2d 1019 (Wyo.1977); and *In re Utah Idaho Sugar Co.,* 57 Wyo. 425, 120 P.2d 601, 607 (1942).

In the instant case, the record indicates that Sinclair Oil was aware from the outset that True Drilling Company was going to be the drilling contractor and by late 1980, Sinclair Oil had become aware that other affiliates were providing services to the well. The record further reveals that True Oil billed the joint account on the basis of the charges billed to True Oil by the affiliated companies, which included a profit margin, and invoices of these charges were sent to Sinclair Oil beginning in 1980. Sinclair Oil never complained that the prices being charged were not at the cost to the affiliates. In August 1982, Sinclair Oil asked if rig costs could be lowered, based on their knowledge of decreasing costs for comparable rigs throughout the industry, but not on any claim that the affiliates, specifically True Drilling Company, were not billing at their cost. Additionally, Sinclair Oil calculated the point that its initial $2.5 million investment would be exhausted based on the invoices received which reflected payment to the affiliates at competitive prices. Sinclair Oil used this estimate

in determining when to withdraw from further cost participation.

Most telling, with respect to practical construction of the contract by the parties, was Sinclair Oil's posture on this issue before and during trial. Beginning in 1983, with its answer and counterclaim to True Oil's complaint and through the end of the trial in 1985, Sinclair Oil defended on the asserted basis that the Unit Operating Agreement controlled between the parties and that True Oil was bound by the provision therein, that an operator, using operator owned equipment, may only bill the non-operator at either operator's cost plus eight percent or competitive rates minus twenty percent.[10] The only time Sinclair Oil asserted the position that the affiliates were limited to billing at their cost was in its written final argument submitted at the conclusion of the trial. The conduct of the parties, particularly Sinclair Oil, belies any intent or understanding that their contract required the affiliated partnerships to provide services and equipment at their cost.

"Parties are far less liable to have been mistaken as to the meaning of their contract during the period while harmonious and practical construction reflects that intention than they are when subsequent differences have impelled them to resort to law, and one of them then seeks a construction at variance with the practical construction they have placed upon it of what was intended by its provisions."

*J.W. Denio Milling Co. v. Malin,* 25 Wyo. 143, 165 P. 1113, 1115 (1917) (quoting 6 R.C.L. at 853).

Sinclair Oil argues, and the trial court found in evaluating extrinsic evidence, that Earl Holding and Dave True had orally agreed that the well would be drilled at "Dave True's cost." This was a finding of fact by the trial court and as such can only be set aside on appeal if not supported by

---

10. In its decision, the trial court rejected Sinclair Oil's theory that the Unit Operating Agreement controls. In a post-trial letter to counsel for both parties, the trial court observed that the Unit Operating Agreement added nothing but confusion. On appeal, neither party asserts that the Unit Operating Agreement should control on the issue of costs. As to this subject, for remand, the trial court decision constitutes the law of the case. *Kaler v. Puget Sound Bridge & Dredging Co.,* 72 Wash. 497, 130 P. 894 (1913). See also *Gifford–Hill–Western, Inc. v. Anderson,* 496 P.2d 501 (Wyo.1972) in analysis of the law of the case.

substantial evidence, clearly erroneous or contrary to the great weight of the evidence. *Walter v. Moore,* 700 P.2d 1219 (Wyo.1985). However, findings of fact which are not supported by the evidence, contrary to the evidence, or against the great weight of the evidence may not stand. Id. at 1222. The only evidence supporting this oral agreement was the testimony of Earl Holding that he understood the project was to be done at "Dave True's cost." No other evidence of this alleged oral agreement is in the record. On the other hand, the testimony of Dave True that the project was to be done at True Oil's cost is consistent with the written agreement, which was approved by top management and counsel for Sinclair Oil before execution. Also significant is that Sinclair Oil's position on the cost issue in the proceeding below is inconsistent with any such oral agreement. Sinclair Oil's evidence, particularly as presented through its auditors, was directed at demonstrating noncompliance with the Unit Operating Agreement and Accounting Procedure cost provisions. Under these circumstances, we hold that the trial court's finding of an oral agreement to drill the well at "Dave True's cost" is not supported by the evidence, is against the great weight of the evidence, and cannot be sustained.

 Sinclair Oil more stridently urges that True Oil was an agent and trustee for Sinclair Oil and the resulting fiduciary obligations prohibited True Oil from contracting with its affiliated partnerships above cost at competitive prices. The trial court similarly concluded that the partners in the affiliated partnerships could not do indirectly what they agreed through Dave True not to do directly. While we recognize that a fiduciary relationship existed between True Oil and Sinclair Oil, we are of the opinion that the rights and duties of the parties are controlled by their agreement. We find that the agreement of the parties was that True Oil was to develop and operate the initial well at its costs as operator and not to provide profit free services from all of the True family enterprises.

In this respect, the distinction between an operator, designated to develop mineral leases, and a drilling contractor, hired to do the actual drilling, must be kept in mind. See *Greenan v. Ernst,* 408 Pa. 495, 184 A.2d 570, 581 (1962). True Oil is not a drilling business. Under its authority as operator, True Oil could have contracted with any drilling company to drill the Deadman well and, in fact, the record reveals that True Oil did contact other drilling companies when the need arose for a larger rig for the second phase of drilling. The same is true with respect to the services provided by the other affiliated companies. The record contains uncontradicted testimony by the management personnel of the various True entities that these entities do a considerable amount of work for companies other than True Oil, as much as seventy-five percent in certain instances. In addition, the record discloses that Sinclair Oil had on prior occasion independently employed True Drilling Company. Further, the record indicates that True Oil often obtains these same services from non-affiliated companies.

We are persuaded in construction of the agreement and operational events that followed that competitive rates were what was mutually contemplated from the outset until after non-consent notice. Under these circumstances, this court determines that the fiduciary duty to be met by True Oil was to obtain drilling and related services at a reasonable cost as reflected by competitive rates. The following language in *Tenneco Oil Co. v. Bogert,* 630 F.Supp. 961, 967 (W.D.Okla.1986) is instructive:

Even though the present joint operating agreement may be seen to create a joint venture with attendant fiduciary duties, the court is mindful that the term "fiduciary" is easily bandied-about without precision. "The scope of the transactions affected by the relation and the extent of the duties imposed are not identical in all fiduciary relations." Restatement (Second) of Trusts § 2 comment b (1959). In the case of joint ventures to develop oil and gas properties, the law is well established that the determination of the existence and extent of such

duties is controlled by the terms of the agreement between the parties.

In relation to fiduciary duty, Sinclair Oil refers us to *Beadle v. Daniels*, 362 P.2d 128 (Wyo.1961). We are not convinced that Beadle is of assistance to Sinclair Oil. In that case, the corporate driller was the designated operator under contracts termed "Contract for Conveyance of Interest in Oil and Gas Lease, and for Operation and Development Thereof" by which interests in an oil and gas lease were conveyed to various non-operating parties. Id. at 129. The contracts provided that the "Operator shall charge Non-operator with his proportionate share of the expenses and costs incurred thereon" in the performance of drilling and oil and gas operations. Id. at 129. The president and executive vice-president of the drilling company, as individuals, purchased certain production equipment, including a pump jack and sucker rods, at a bargain price. The officers supposedly sold the pump jack and sucker rods to the corporation for use on the lease at an enhanced price and the non-operators sued to recover the excess charges. There was no evidence that the purchase was approved or even discussed by the directors or the stockholders of the drilling company, nor was any entry of the transaction made in the corporate minute book. Id. at 129.

We held in *Beadle*, 362 P.2d at 130 that the officers were agents for the corporation and their acts in this instance were the acts of the drilling company, so the cost to the individuals for the materials became the cost to the corporation. This court then held that the driller was the agent for the non-operators and, as operator, it could only charge actual cost pursuant to the "expense and cost" provision of the *controlling* operating agreements.

In *Andrau v. Michigan Wisconsin Pipe Line Co.*, 712 P.2d 372, 375 (Wyo.1986), in commenting on Beadle, we said:

> The holding in *Beadle v. Daniels* was that the operating agreements imposed a fiduciary duty upon the operator which prevented the operator from charging nonoperators a higher price for pumping equipment than had been paid by the operator. *Beadle* does *not* stand for the proposition that a fiduciary relationship exists between operators and nonoperators irrespective of their express agreement. [Emphasis added.]

The facts here are different from *Beadle*. The contracts for services and equipment entered into between True Oil and various affiliates were negotiated between management personnel of the separate partnerships and corporations. For example, the drilling contracts (designated as Bid Sheet and Drilling Order) between True Oil and True Drilling Company were executed by J.D. Milliken, manager for True Oil, and R.P. Kirkpatrick, assistant manager and drilling superintendent for True Drilling Company. The record showed that even though the True entities share a common ownership, the management, employees, and financial affairs are separate for each affiliate. Under these circumstances, we do not perceive that the acts of the affiliates were the acts of True Oil, and profit to the affiliates is not profit to True Oil.

Within these circumstances, we recognize that, as opposed to the situation in *Beadle*, True Oil as operator did not charge Sinclair Oil a higher price for services and equipment than was paid by True Oil; thus, True Oil did not violate its fiduciary duty to Sinclair Oil. In sum, we hold that True Oil was entitled to bill the parties' joint account for services and equipment provided by True Drilling Company, Eighty–Eight Oil Company, and True Leasing Company to be chargeable in an amount not in excess of competitive rates.[11]

**B. Costs of rigs and camp provided by True Drilling Company and True Leasing Company.**

 Our analysis of the propriety of disallowing the rigs and camp costs is set

---

11. It of course follows that, as found by the trial court, the charges reflecting competitive rates attributable to the corporate affiliates, Black Hills Trucking and Toolpushers Supply Company, could be billed to the joint account. In retrial, contest of the competitiveness of billed charges is not foreclosed for either affiliated or non-affiliated suppliers and services.

out separately because a different standard of review is applicable. At the end of True Oil's case, Sinclair Oil moved for a motion to dismiss and the trial court reserved ruling. In the post-trial proceedings the trial court, as a result of its ruling on the costs issue and the fact that True Oil did not submit proof of these affiliate partnerships' costs without profit, granted the motion to dismiss insofar as rigs and camp charges were concerned.

Our standard of review of a motion to dismiss granted at the end of a plaintiff's case in chief resulting in a W.R.C.P. 41(b)(1)[12] ruling needs further explanation to differentiate the rigs and camp charges. Essentially, this court applies a directed verdict analysis, taking the plaintiff's evidence as true and affording it all favorable and reasonable inferences. *Osborn v. Manning*, 685 P.2d 1121 (Wyo.1984); *Fuller v. Fuller*, 606 P.2d 306 (Wyo.1980); *Angus Hunt Ranch, Inc. v. Reb, Inc.*, 577 P.2d 645 (Wyo.1978); *Svalina v. Big Horn Nat. Life Ins. Co.*, 466 P.2d 1018 (Wyo. 1970); *Hawkey v. Williams*, 72 Wyo. 20, 261 P.2d 48 (1953). " 'A motion for judgment at the close of the plaintiff's case is in the nature of a demurrer to the evidence, and admits its truth.' " *Hawkey*, 261 P.2d at 55 (quoting *Boyle v. Mountford*, 39 Wyo. 141, 147, 270 P. 537, 539 (1928)). This court in *Fuller*, 606 P.2d at 307–08 clarified this issue of involuntary nonsuit:

> Where the plaintiff's proof has failed in some aspect, the motion should be granted—where the plaintiff's proof is overwhelming, the motion should be denied. Where the plaintiff has presented a prima facie case based on unimpeached evidence, the trial judge should not grant the motion even though the judge himself may feel that the plaintiff has not sustained his burden of proof. *Arbenz [v. Bebout]*, supra [444 P.2d 317 (Wyo. 1968) ]; *Kure v. Chevrolet Motor Division*, Wyo., 581 P.2d 603 (1978); and

*Angus Hunt Ranch, Inc. v. Reb, Inc.*, Wyo. 577 P.2d 645 (1978).

When this situation is properly assessed, we conclude that True Oil made a prima facie showing of the costs of the rigs and the camp. The trial court acknowledged as much in its decision letter, but failed to allow True Oil the costs simply because the profit margin of these endeavors was not separated out from their total costs. Therefore, the "Order Granting Motion to Dismiss" is reversed. Upon remand, True Oil is entitled to prove costs of operations through September 10, 1982 based on competitive rates charged by all the affiliates, and is entitled to a judgment for the balance due of Sinclair Oil's proportionate share of those costs as incurred prior to September 10, 1982. Sinclair Oil, however, may challenge any claims for any or all drilling costs as loaded or non-competitive.

## VII. RIGHT TO PROCEEDS FROM DEADMAN/TELEPHONE PASS EXCHANGE AGREEMENT

In final issue, True Oil contends that the trial court erred as a matter of law in division of the benefits received from the Deadman/Telephone Pass Exchange Agreement, which gave Sinclair Oil a twenty-five percent share of $550,000, $137,500, and a five percent (1.25%) overriding royalty interest. We agree partially with True Oil's contention.

The conclusion of the trial court on this issue is reiterated as the appellate argument by Sinclair Oil. The trial court determined that the Deadman Agreement contained two distinct sets of contractual rights and obligations in assessing that the agreement produced an outright conveyance of leasehold rights and interests associated with the farmout and acreage contribution agreements. The trial court characterized these leasehold rights and interests

---

12. W.R.C.P. 41(b)(1) provides in pertinent part: After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

as separate and distinct from the obligation to share in all costs of the test well and any subsequent wells, and from the right to share in oil production, if any. The trial court found that the property purchased by the Telephone Pass Group represented a property interest to both Sinclair Oil and True Oil which existed throughout their venture no matter how long they mutually continued to contribute. The trial court concluded that the Deadman Agreement was a joint venture and neither the agreement nor the joint venture was terminated prior to the execution of the Deadman/Telephone Pass Exchange Agreement.

First, we cannot agree with the trial court's construction of the agreement as conveying a leasehold interest. In construing a contract, we must consider it as a whole and take into account the relationships between the various parties, if that can be done and a reasonable construction achieved. *Sunburst Exploration, Inc.,* 635 P.2d 822; *Northern Gas Co. v. Town of Sinclair,* 592 P.2d 1138 (Wyo.1979). The pertinent provisions as to rights, interests, and obligations of the parties in the Deadman Agreement are the following:

WHEREAS, True holds certain Farmout and/or Acreage Contribution Agreements covering lands and leases situated within and which have been committed to the Deadman Unit, and

WHEREAS, Sinclair has requested that it be allowed to acquire an *interest in said Agreements and participate with True in the drilling of the required well,* and

WHEREAS, the parties have reached *agreement for participation by Sinclair subject to terms and conditions herein set forth,*

NOW, THEREFORE, the parties hereto agree as follows:

I. By execution of this Agreement, True grants to Sinclair an undivided one half *interest in and to the rights to earn* certain leasehold interests as set forth in the Farmout and/or Contribution Agreements * * *:

* * * * * *

II. Execution of this Agreement by Sinclair shall evidence their acceptance of the interest granted and their agreement *to be bound by all of the terms and conditions of this Agreement* and all of the terms and conditions of the Farmout and Contribution Agreements * * *.

* * * * * *

V. The *net interests in acreage earned or contributed* under Farmout or Contribution Agreements * * * and the proceeds from the sale of oil, gas or other hydrocarbon substances from said interests, *shall be shared* in the following proportions:

True ⎯⎯⎯⎯50% [amended to seventy-five percent]

Sinclair ⎯⎯⎯50% [amended to twenty-five percent]

Further, it is agreed that all costs of drilling, testing, completing and operating the initial test well until payout is reached as defined in the Farmout Agreements, including costs of forming the Unit, acquiring access to location, building roads and location, moving in and out a spudder and any other related operations shall be borne in the following proportions:

True ⎯⎯⎯⎯50% [amended to seventy-five percent]

Sinclair ⎯⎯⎯50% [amended to twenty-five percent]

As to all subsequent wells drilled on the jointly acquired acreage, all costs and income shall be shared by the parties according to their respective net working interests. [Emphasis added.]

Reading these provisions together, it is clear that under the agreement, Sinclair Oil acquired *an interest in the right to earn leasehold interests subject to the obligation to share proportionately in all costs associated with the enterprise.* True Oil could not grant a leasehold interest in the subject acreage at the time of the agreement because True Oil had no leasehold interest at that point. True Oil simply was a party to agreements whereby it could earn leasehold interests by well drilling. Contrary to the ruling of the trial

court, the property interest purchased by the Telephone Pass Group did not exist throughout the venture, but rather it came into existence and its dimensions were defined by the venture drilling of the Deadman well.

Under the Deadman Agreement, Sinclair Oil obtained a right to participate in the costs and rewards of the project. While Sinclair Oil did not actually breach the agreement by pulling the plug on September 10, 1982, it does not follow under any reasonable construction of the agreement that Sinclair Oil could continue to reap the rewards of further drilling without continuing to contribute to costs. Sinclair Oil ceased earning interests under the farmout and contribution agreements when it noticed nonconsent and discontinued its drilling cost contributions.

The trial court found the enterprise of the parties to be a joint venture. Existence of a joint venture is a question of fact for the trier of fact. *Madrid v. Norton*, 596 P.2d 1108 (Wyo.1979); *P & M Cattle Co.*, 559 P.2d 1019. We believe this finding is supported by the evidence. We further observe, however, that "[a] joint venture sounds in, and is founded upon, contract." *Madrid*, 596 P.2d at 1119. Sinclair Oil urges, and the trial court found, that Sinclair Oil's withdrawal from the project only pertained to "the well" and did not affect other rights and interests, and was not an abandonment of the venture. We cannot agree. The scope of the joint venture was defined by the Deadman Agreement as being the drilling of the initial well and the sharing of the interests earned thereby. Although the sharing of costs and proceeds of any subsequent wells is mentioned, no agreement to drill such wells was made. Under our construction of the contract, Sinclair Oil's notice to True Oil that it would no longer consent to expenditures on the well affected an abandonment and termination of the joint venture, although such

abandonment was not a breach since it was a joint venture at will. Therefore, under these circumstances, we hold that Sinclair Oil abandoned the joint venture and ceased to earn further interests in acreage earned by drilling after non-consent date.

Although we hold that Sinclair Oil is only entitled to share in the consideration from the Deadman/Telephone Pass Exchange Agreement to the extent that the acreage and interests transferred to the Telephone Pass Group had been earned as of September 10, 1982, we are aware that this may have only a minimal effect on the division of such proceeds. True Oil maintained in the proceeding below that the Deadman/Telephone Pass Exchange Agreement would not have occurred absent the continued drilling by True Oil. At the time of Sinclair Oil's withdrawal from the venture, however, the well had been drilled to a depth of approximately 11,665 feet, thereby satisfying most or all of the depth requirements of the farmout and contribution agreements. The exact dimensions of the interests actually earned and the corresponding rights in the consideration received will be subject to the proof of the parties upon remand on a prorated acreage basis so that True Oil receives sole benefit for any acreage earned after September 10, 1982.[13]

## VIII. SANCTIONS

Sinclair Oil in appellate briefing and by separate motion has sought sanctions against True Oil and its counsel under W.R.C.P. 11 and Rule 3.3(a)(1), Wyoming Rules for Professional Conduct. The issue, of course, dies with the decision we make. Counsel for True Oil actively represented their client as did the firm representing Sinclair Oil, and with our disposition on the merits, we decline to sanction either party.[14]

---

**13.** We acknowledge the potential unfairness to True Oil since that last, very expensive, two thousand feet may have provided information which made the prospect saleable. We will, however, not remake the deal to eliminate the mutual right to determine the depth provision. This application of the agreement gives the non-

operating partner a percentage of what acreage was earned to the date of discontinued cost contribution.

**14.** We do have some real problems with the atmosphere of this litigation, both at trial and in appellate briefing. There is a childhood truism

## IX. CONCLUSION

We affirm as to Sinclair Oil's right to withdraw from the project as of September 10, 1982. We reverse the trial court's disallowance of affiliate charges, provide for modification in division of consideration received from the Deadman/Telephone Pass Exchange Agreement, and remand for further proceedings consistent with this opinion. The trial judge may want to reassign this case for retrial. Cf. *Madsen v. Prudential Federal Sav. & Loan Ass'n*, 767 P.2d 538 (Wyo.1988).

Affirmed in part, reversed in part, and remanded.

that a stitch in time saves nine. Appropriately paraphrased in 1989, it would be said a thought in mind saves time.

The supposition of hardball lawyering deserves that reflection as highlighted in Hinerfeld, *The Sanctions Explosion,* California Lawyer, Nov. 1987, at 82:

Perhaps the greatest irony of this decade's emphasis on sanctions is noted by Thornton [Timothy M. Thornton, Jr., a personal injury defense lawyer in Los Angeles, California] and echoed by a number of other litigators: "The type of motion most often brought frivolously is a motion for sanctions," Thornton says. "It's just automatically attached."

The same irony was anticipated by Harvard Law School Professor Arthur Miller, who par-

ticipated in the reform of federal civil procedures. Miller told the Second Circuit Judicial Conference in 1984 of his "Kafkaesque dream" in which motions for sanctions would be countered with motions to sanction frivolous motions for sanctions, which would be similarly countered with more motions for sanctions, ad infinitum.

Routine requests for sanctions have prompted Judge Wiggins and others to call for a cease-fire on rule 11 motions. "This take-no-prisoners attitude you get from macho litigators in the big cities has to stop," says Wiggins. "The rule was never intended as a litigation tool. It is intended to deter misconduct, not to reward the other side."