**NORTHERN IMPROVEMENT COMPANY, Appellant (Plaintiff),**

v.

**WYOMING STATE HIGHWAY COMMISSION, Appellee (Defendant).**

**No. 89–287.**

Supreme Court of Wyoming.

Dec. 14, 1990.

Raymond W. Martin of Godfrey & Sundahl, Cheyenne, for appellant.

James L. Applegate and John J. Metzke of Hirst & Applegate, Cheyenne, for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

MACY, Justice.

Appellant Northern Improvement Company appeals from a judgment in favor of Appellee Wyoming State Highway Commission, denying Appellant's claim for costs of grinding a portion of Interstate 80, which Appellant paved pursuant to a contract with Appellee.

We affirm.

Appellant presents the following issues:

1. Were the contract specifications adequate to insure the quality of ride demanded by the Appellee?

2. Did reasonable conformity with grade, as imposed by Appellee, become arbitrarily and capriciously identified and measured by a subjective ride test, such that excessive remedial costs were incurred by Appellant?

3. Did the contract plans and specifications grant Appellee unlimited discretion to determine the satisfactory and acceptable fulfillment of the contract?

4. Was the evidence sufficient to support the trial court's finding that public policy safety considerations were a component of Appellee's decision to direct Appellant to grind the pavement surface?

In 1985, Appellant and Appellee entered into a contract for the repavement of a portion of Interstate 80 near Rock Springs, Wyoming. The contract was subject to specifications articulated in the Highway Department's Specifications for Road & Bridge Construction (1980 ed.) and certain supplementary specifications. The specifications described, *inter alia,* the procedure for determining the quality and acceptability of the completed project. Section 105.01 of the Specifications for Road & Bridge Construction stated in pertinent part:

The Engineer will decide all questions which may arise as to: The quality and acceptability of materials furnished and work performed; the rate of progress of the work; cooperation between Contractors; the interpretation of the plans and specifications; and the acceptable fulfillment of the contract on the part of the Contractor.

Section 105.03 provided:

All work performed and all materials furnished shall be in reasonably close conformity with the lines, grades, cross sections, dimensions, and material requirements, including tolerances, shown on the plans or indicated in the specifications.

\*　　\*　　\*　　\*　　\*　　\*

If the Engineer finds that the materials or the finished product in which the materials are used or the work performed are not in reasonably close conformity with the plans and specifications and have resulted in an inferior or unsatisfactory product, the work or materials shall be removed and replaced or otherwise corrected by and at the expense of the Contractor.

Section 105.08 stated in pertinent part:

The Engineer will set construction stakes establishing lines, slopes, and continuous profile grade in road work, and centerline and bench marks for bridge work, culvert work, protective and accessory structures, and appurtenances as he may deem necessary, and will furnish the Contractor with all necessary information relating to lines, slopes, and grades. These stakes and marks shall constitute the field control by and in accordance with which the Contractor shall establish other necessary controls and perform the work.

The specifications also stated:

As soon as the concrete has hardened sufficiently, the pavement surface shall be tested with a ten-foot (3 m) straightedge or other specified devices. Areas showing high spots of more than ⅛ inch (3 mm), but not exceeding ½

inch (13 mm) in ten feet (3 m) shall be marked and immediately ground down with an approved grinding tool to an elevation where the area or spot will not show surface deviations in excess of ⅛ inch (3 mm) when tested with a ten-foot (3 m) straightedge.

Section 414.16. Section 414.15F provided in pertinent part:

Straightedge testing and surface corrections shall continue until the entire surface is found to be free from observable departures from the straightedge and the slab conforms to the required grade and cross section.

Appellant completed the project in two phases. After Appellant completed phase I, Appellee's district engineer drove a vehicle over the pavement and approved the quality of the surface.[1] When Appellant completed phase II, Appellee's district engineer again drove a vehicle over the paved surface. He discovered that the surface had a series of flaws described at trial as a "harmonic wave." He advised Appellant that the quality of the surface was unacceptable and that the surface would have to be ground to remove the wave. A straightedge test revealed that the surface deviated from the straightedge requirement in more than 200 places. The grade of the pavement was also compared to the grade requirements as designated by stakes which had been placed at fifty-foot intervals along the course of the interstate.[2] The pavement did not deviate from the grade requirements on those stakes at the location of the stakes, but a string test indicated that deviations as great as three-fourths of an inch existed at points between the stakes.

Appellee directed Appellant to grind the surface of the pavement until the harmonic wave was removed. Appellant asked Appellee to provide an objective standard for grinding the pavement. In response, Appellee demanded that Appellant grind the surface to meet a standard measured by a profilograph, which profiles the surface of the road. Neither the contract nor the specifications mandated the use of the profilograph or a ride test as a method for testing the quality of the surface. The grinding required to meet Appellee's profilograph standard was more extensive than the grinding required to meet the straightedge test. Appellant ground the pavement to the district engineer's satisfaction and filed a claim with Appellee, seeking reimbursement for the additional cost of grinding the surface in phase II to the profilograph standard.

Appellee's chief executive staff reviewed and denied Appellant's claim. Appellant subsequently filed a petition for review with the district court. The district court viewed the petition as an original complaint.[3] Appellant alleged that Appellee used standards not specified in their contract to require excessive grinding of the entire phase II surface and sought recovery for grinding work not attributable to its failure to meet the straightedge test. The district court conducted a bench trial and ruled in favor of Appellee. The court found that the specifications gave Appellee's district engineer sufficient authority to require Appellant to remove a defect which was unsafe and unacceptable.

The disposition of this case depends upon the answers to two questions:

1. Did the terms of the highway construction contract between Appellant and Appellee permit Appellee to require that Appellant remove a flaw in the pavement even though the surface satisfied a standard incorporated into the contract?

---

1. Section 101.21 of the Specifications for Road & Bridge Construction defined "engineer" as "[t]he Chief Engineer of the Department acting directly or through his duly authorized representatives, who is responsible for engineering supervision of the construction."

2. Section 101.36 of the Specifications for Road & Bridge Construction defined "profile grade" as "[t]he trace of a vertical plane intersecting the top surface of the proposed wearing surface or top surface of pavement, along the center line or other reference line of any given roadway surface as shown on the plans. Profile grade means either elevation or gradient of such trace according to the context."

3. Since Appellee's enabling statute does not authorize the agency to adjudicate its contract disputes, an aggrieved party's remedy is a trial *de novo* in a court of law. *State Highway Commission of Wyoming v. Brasel & Sims Construction Co., Inc.*, 688 P.2d 871 (Wyo.1984).

2. Is the district court's decision supported by sufficient evidence?

The answer to the first question is dependent upon our interpretation of the parties' contract.

> The determination of the parties' intent is our prime focus in construing or interpreting a contract. "If an agreement is in writing and the language is clear and unambiguous, the intention is to be secured from the words of the agreement." *Nelson v. Nelson*, 740 P.2d 939, 940 (Wyo.1987). When the language is clear and unambiguous, the writing as a whole should be considered, taking into account relationships between various parts. Contract construction and interpretation are done by the court as a matter of law.

*True Oil Company v. Sinclair Oil Corporation*, 771 P.2d 781, 790 (Wyo.1989) (citations omitted). *See also St. Paul Fire and Marine Insurance Co. v. Albany County School District No. 1*, 763 P.2d 1255 (Wyo. 1988). We have stated our standard of review of factual issues many times. We must decide if sufficient evidence supports the findings of the trial court.

> "[W]here the sufficiency of evidence is an issue we uphold the judgment if there is evidence to support it, and in so doing we look only to the evidence submitted by the prevailing party and give to it every favorable inference which may be drawn therefrom, without considering any contrary evidence."

*True Oil Company*, 771 P.2d at 788 (quoting *Hance v. Straatsma*, 721 P.2d 575, 578 (Wyo.1986)).

■ Appellant does not dispute that the surface of phase II failed to meet the straightedge specification in more than 200 places, nor does it dispute that a wave existed in the surface of the pavement which could be detected by a driving test, a profilograph test, or a string line test. Instead, Appellant argues that it was required to grind only the spots which did not meet the straightedge specification because

that was the only specification contained in the contract which dealt with conformity of the grade.

Appellee counters by arguing that the terms of the contract were broad enough to allow the district engineer to require Appellant's removal of a wave which could not be detected by the straightedge test. Appellee maintains that it employed the profilograph test to satisfy Appellant's request for guidance on how much to grind. Appellee also asserts that the district engineer's demand was reasonable because the wave posed a safety threat to motorists.

Applying our standard for the interpretation of a contract, we hold that the district court's interpretation is correct as a matter of law. While Appellant's position that it was required to comply with the straightedge specification set out in § 414.16 of the Specifications for Road & Bridge Construction is correct, Appellant was also required to satisfy the grade requirements of the plans and specifications. Section 105.03 and the supplementary specifications clearly stated that all work must be in conformity with the grades on the plans.[4] In addition, § 105.01 provided that the district engineer would determine whether the work was acceptable according to his interpretation of the plans and specifications.

We also hold that the court's factual conclusions are supported by sufficient evidence. After listening to testimony for three days and reviewing almost fifty documents, the district court found that the preground surface of phase II did not meet the contract's grade requirements. The court emphasized the fact that the grade of the pavement deviated between the stakes which were set at fifty-foot spacings. Appellant has failed to demonstrate that the district court's finding was not supported by sufficient evidence. Since Appellant's work did not conform to the requirements of the contract, Appellant was financially

---

**4.** Supplementary specification SS–400LA provided in pertinent part:

> This work shall consist of constructing a pavement * * * on an existing base in accordance with this special provision, the standard specifications and in conformity with the lines, grades and typical cross sections shown on the plans.

responsible for the curative remedy. Sections 414.15 and 105.03.

Affirmed.

URBIGKIT, Chief Justice, dissenting.

This case provides the broad perspective of what, if any, limitations the supervising highway engineer has in assessing extra or supplementary construction obligations on the contractor. In essential detail, the facts of this case are not in dispute. I dissent from the decision which interjects discretional authority for desired satisfaction of the engineer as the criteria for work acceptance where satisfaction is in no regard a term of the contract documents executed between the parties. It is my perspective that this majority adds a dimension to the supervising engineer's approval authority which was not, and never would have been, an anticipated condition of the contractor's performance responsibility when he bid and entered into the particular road construction contract.

Appellant contracted to install a concrete overlay on a segment of the interstate highway system near Rock Springs, Wyoming. Neither a road test criteria nor an engineer's satisfaction standard was included in the plans and specifications or contract documents. After the installation work had been completed, the engineer drove over the road and encountered what he described, in asserting his dissatisfaction, as a "harmonic wave." The contractor was directed to grind the concrete surface of the roadway until the wave effect on passing vehicles was removed.[1] One thing is agreed between the litigants as recognized both in majority decision and this dissent. *There were no contractual documents* which established either a profilograph test to profile the road surface or a road test for work acceptance. The test addressed by contract was a straight-edge test which is conceded to be less difficult to achieve than either the objective test of the profilograph or the completely subjective decision of the engineer in assessing his individual dissatisfaction with the ride provided. However, the engineer, responding to his dissatisfaction, detailed that the contractor embarked upon a grinding process for the road surface to a profilograph standard in order to satisfy his interest in a proper ride.

I do not disagree with the authorities cited for decision by this majority. The problem is invalid application in addressing specific contract documents that either establish the subjective criteria of satisfaction or the objective criteria of profilograph for work obligation. It is clear from the record provided that a substantial part of the increased cost incurred in attempting to achieve satisfaction was the failure of the engineer to provide an objective standard of exactly how much grinding of the road surface would be required to achieve acceptability. Satisfaction by ride is not empirically determinable and no more, and perhaps less, than the obligation to coat the road surface with gold. Neither was agreed and neither should be required. The engineer's discretion and decision was confined to objective determinations from explicit plans and specifications and not to subjective dissatisfaction because the criteria for straight-edge analysis provided for in the contract did not satisfy his criteria for the anticipated final product.

It is my perspective that the State Highway Department writes the specifications and determines the cost ingredient for road construction. The engineer here asked for more than was provided or undertaken and, consequently, the contractor should be entitled to additional compensation.[2]

---

1. As a matter of passing interest, a similar condition appears to exist in the northbound travel lanes of I–25 near the vicinity of the State Highway building located in Cheyenne, Wyoming.

2. This case provides more than just an academic exercise in contract analysis when applied to the characteristics and character of individual highway engineers. The record provides some intimation within a fact generally understood in the building industry that the fairness and professionalism of the highway engineer is a singular constituent of the cost analysis for totaling the final bid. To now add "satisfaction" as an intangible criteria can only add to the indeterminate elements for which an appropriate upward cost adjustment must be added if the contractor can be expected to survive very long in the contingent-filled world of road construction.

This highway construction contract provided for a one-eighth inch in ten foot straight-edge specification as a deviation factor which is now generally recognized to be "an inadequate specification to insure the increasingly higher standards of riding comfort expected by the motoring public." In this case, the State Highway Department bid one requirement and then applied another more arduous and expensive one. This majority now justifies the additionally expensive requirement as obtainment of the "satisfaction" of the highway engineer. In doing this, we do not apply the intent of the litigants, but instead rewrite the contract to overlay its terminology with a new instrument, namely "satisfaction."

Consequently, I dissent.